UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CRAIG MOLESPHINI on behalf of himself and
derivatively on behalf of NUE-TRITION
WEIGHT MANAGEMENT, LLC, and
ELEPHANT ENTERTAINMENT INC.,
individually

   Plaintiffs,

   - against -

ANTHONY GIORDANO, and NÜE
RESOURCE FINANCIAL CORP.,

   Defendants,

   -and-

NUE-TRITION WEIGHT MANAGEMENT,
LLC,

   Nominal Defendant.

---

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

   Plaintiffs Craig Molesphini and Elephant Entertainment Inc., by and through their

attorneys, the Law Office of Alexander Sakin, LLC, bring this action sounding in violation of

Rule 10b-5, fraud, breach of fiduciary duty, and other claims, and allege as follows:

### NATURE OF THE ACTION

   1. In 2014, Plaintiff Craig Molesphini, while working as a doorman at an exclusive

Manhattan nightclub, befriended Defendant Anthony Giordano, a customer of the club and a

high-spending, flashy businessman.  Over the next year, Giordano entertained Molesphini at his

expense, deceiving Molesphini into thinking that their relationship was a genuine friendship.  All

the while, however, Giordano was laying the groundwork for a devious scheme whose objective

was to induce Molesphini into turning over his life's savings to Giordano.

1

2.      First, in 2015, Molesphini paid $175,000 in exchange for shares of Nue-Trition Weight Management, LLC ("Nue-Trition"), a start-up founded and managed by Giordano to develop and sell nutrition supplements.  At all times before and after Molesphini's investment in Nue-Trition, Giordano promised Molesphini that his funds would be spent, and were being spent, on the development of Nue-Trition's fledgling business.

3.      Then, in 2016, on the strength of such assurances regarding Nue-Trition, Giordano went on to invest an additional $234,600 in additional shares of Nue-Trition.  By the end of 2016, Molesphini had invested some $409,600 – the bulk of his life savings – with Giordano or entities controlled by Giordano.

4.      Unbeknownst to Molesphini, instead of investing the $175,000 in Nue-Trition, Giordano had seized personal control of the money, spending it on various personal needs having nothing whatsoever to do with Nue-Trition's business.  Likewise, Giordano spent all or much of Molesphini's $234,600 investment on similar lifestyle purchases completely unrelated to Nue-Trition's operations.

5.      Enriched by Molesphini's life savings, Giordano used the $409,600 invested by Molesphini in Nue-Trition to rent an expensive Manhattan apartment, buy luxury watches for himself, fund fancy vacations to Las Vegas and Miami, and spend huge sums on his and his friends' regular outings at expensive Manhattan nightclubs.  As for Nue-Trition, despite Giordano's explicit promises, little to no progress was made on developing Nue-Trition's business.  Indeed, by 2017, the company had effectively ceased all operations.  As Molesphini learned only much later, Giordano had never devoted anywhere close to sufficient resources into the production of the nutrition supplements that were Nue-Trition's *raison d'etre*, instead diverting monies invested by Molesphini to fund his lifestyle.

6.      No part of Molesphini's $409,600 investment has been returned, either in the form of dividend payment or otherwise.

7.      As of today, some four years later, a duped, defrauded, and betrayed Molesphini has spent $409,600, depleted his life savings, and thrown his life into turmoil.  In the wake of Giordano's lies, deceptions, and fraud, Molesphini has nothing to show for his investment.  As Molesphini learned only too late, he is the victim of a fraud perpetrated by Giordano on him and – as it turned out – on at least two other individuals similarly duped into surrendering large sums of money on false pretenses, and in return for promises that Giordano never had any intention of honoring.  This action follows.

## JURISDICTION AND VENUE

8.      This action arises under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, and this Court has subject matter jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) and Section 27 of the Securities Exchange Act of 1934, as a substantial part of the events giving rise to Plaintiffs' claims occurred here.

## PARTIES

10.      Plaintiff Craig Molesphini, who is currently 41 years-old, is an individual and a domiciliary of the State of New York, County of New York.  After graduating from high school and college on Long Island, Molesphini headed to New York City where he worked a series of jobs, including as doorman at the exclusive Manhattan nightclub where he met Giordano.

11.     Plaintiff Elephant Entertainment, Inc. is a corporation organized under the laws of New York, and operates out of Molesphini's home in Manhattan and is wholly-owned by Molesphini.

12.     Defendant Anthony Giordano is an individual who, at all relevant times, was a resident and domiciliary of Monmouth County, New Jersey.

13.     Defendant Nüe Resource Financial Corp. ("NRF") is a corporation organized under the laws of New Jersey.  At all relevant times, NRF was a mortgage lender that maintained an office in Monmouth County, New Jersey.  Upon information and belief, at all relevant times, Giordano was an owner and CEO of NRF, and had final authority over all decisions taken by and at NRF.

14.     Derivative Plaintiff and Nominal Defendant Nue-Trition Weight Management, LLC ("Nue-Trition") is an LLC organized under the laws of New Jersey, that was founded by Giordano in 2015 ostensibly to manufacture nutrition supplements.  Giordano acted as Nue-Trition's CEO and, together with his brother Louis Giordano, as its managing member.  Nue-Trition was operated by Giordano out of NRF's offices in Red Bank, New Jersey.

## FACTS

### *Plaintiff Craig Molesphini Graduates High School and Starts Working in Manhattan*

15.     In 2014, when he met Defendant Giordano, Molesphini was 34 years-old.  He had grown up on Long Island in difficult financial and personal circumstances, becoming estranged from his family in high school.  Leaving home at age 18 in 1997, Molesphini went to college on Long Island, and after graduating, with no money and few connections, headed to Manhattan.

16.     In Manhattan, the athletic and fitness-oriented Molesphini landed a series of jobs at various nightlife establishments, working as a doorman.  Over the years, through hard work,

he was able to save several thousand dollars.  And through the friendships he formed in the

nightlife industry, Molesphini was able to invest those funds in what turned into a successful

Manhattan restaurant.  The returns on that investment allowed Molesphini to amass some savings

by 2014, when he met Giordano.  Though he did not know it at the time, Molesphini presented

the perfect target for a schemer and fraudster like Giordano.

### Giordano Meets Molesphini and Takes an Interest in Him

17.     To be sure, in 2014, Molesphini was by no means wealthy, was living by himself

in a small, rented walk-up apartment in a prewar building in Manhattan, and relied substantially

on his salary as a doorman at 1 OAK, a nightclub in the Meatpacking District neighborhood of

Manhattan.

18.     In 2014, 1 OAK was a popular, pricey, and exclusive nightclub frequented by

celebrities and other wealthy patrons willing to spend thousands of dollars per nightly outing.

19.     In late spring 2014, Molesphini was contacted by a friend who had been

approached by Anthony Giordano, a businessman from New Jersey.  Giordano wanted to

entertain some of his clients at 1 OAK, and needed help getting into the exclusive nightclub.

20.      Molesphini agreed to help, and on the appointed evening, ensured that Giordano

and his guests were admitted into 1 OAK, and were properly seated and entertained.  Giordano

greatly enjoyed himself, expressing his fulsome gratitude toward Molesphini.

21.     This fateful evening at 1 OAK was the start of the relationship between

Molesphini and Giordano, a relationship that Molesphini came to consider a friendship, but

which Giordano seized as an opportunity for self-enrichment, exploitation, and outright theft.

22.     Taking advantage of his new contact, Giordano began frequenting 1 OAK about

once a week, spending about $2,000-$3,000 each time, and making sure to socialize with

Molesphini on each occasion.

23.     Soon after he became a regular at 1 OAK, Giordano realized that Molesphini presented an opportunity for self-enrichment.  Giordano learned from Molesphini that he had successfully invested in a Manhattan restaurant.  Giordano further learned that Molesphini expected to receive a sizeable settlement from a personal injury lawsuit he had filed in connection with an injury sustained on the job at 1 OAK.  And, taking stock of Molesphini's personality and life experience, Giordano sensed that Molesphini would make a target for one of Giordano's fraudulent schemes.  Of similar age and background to Giordano, Molesphini had a certain emotional vulnerability that made him an ideal target for fraud.

### Giordano Lays the Groundwork for His Fraud by Cultivating a Relationship with Molesphini, His Intended Victim

24.     Over the next few months, Giordano took the lead in cultivating a relationship with Molesphini.  Aside from regularly seeing him at 1 OAK, Giordano started taking Molesphini to regular dinners at The Palm steakhouse in Tribeca, a high-end restaurant.  Doing everything to ingratiate himself with Molesphini, and to impress him, Giordano always paid for these dinners.

25.     Over steaks at The Palm, Giordano painted a picture of himself as someone who, like Molesphini, grew up in humble circumstances in the suburbs of New York City, was socially ostracized in his youth, and succeeded in business – and in life – despite numerous obstacles.  Giordano told Molesphini that he owned Nüe Resource Funding, LLC ("NRF"), a successful mortgage lender headquartered in Red Bank, New Jersey that employed some 30-40 people, and that he was involved in several other businesses.

26.     Knowing that Molesphini grew up in a household where he was neglected and abused, Giordano made sure to stress that he had managed to remain a devoted father, despite the

obstacles thrown into his path.  Shaking with emotion, Giordano once told Molesphini that he was divorced from his mentally unstable ex-wife, had sole custody of his four children, and that he lived with his children at his parents' house in Monmouth County, New Jersey, because he was too busy working outside the house and needed his parents for childcare.

27.     Giordano's persona greatly impressed Molesphini, who aspired to success amidst his own personal difficulties and admired parents who found time for their children.  In Giordano, Molesphini saw an underdog from the suburbs – just like himself – succeeding at business and providing for his family while weathering the storms of single fatherhood. Giordano's tales of family dysfunction involving his ex-wife elicited sympathy in Molesphini, who lived through a troubled childhood, including his parents' rancorous divorce, and who had broken off relations with all of his immediate family members.  To Molesphini, Giordano thus became a close friend and even a role model.

28.     Further, to Molesphini, Giordano's high-spending lifestyle, as evidenced by his frequent trips to expensive Manhattan nightclubs and the regular dinners at The Palm, seemed to confirm Giordano's business and professional success.

### *Giordano Begins to Discuss Possible "Investments" with Molesphini*

29.     Giordano's tales of personal woe mixed with the bragging and high spending were all designed to induce Molesphini, at the opportune time, to "invest" in one of Giordano's fraudulent ventures.  As Molesphini learned much later, Giordano was busy wooing other individuals to invest in his ventures, on false promises.

30.     On June 6, 2015, as part of his courtship of Molesphini, Giordano took Molesphini to an HBO-televised professional boxing match at the Barclays Center in Brooklyn, featuring Miguel Cotto, a world champion boxer.  As during their nightclub excursions,

Giordano used this opportunity to impress Molesphini with his business and financial success. Thus, Giordano assured "VIP" access for Molesphini, paying for his ticket, with the two sitting in some of the best seats in the arena, in the fifth row.

31.     At the match, Giordano introduced Molesphini to Peter Kizenko, his partner in NRF, and the former head of the equity trading desk at Goldman Sachs' Moscow office. Kizenko's impressive background lent further credibility to NRF, and by extension, to Giordano.

32.     In between each round of the match, the NRF name and logo would flash on the jumbotron above the ring, with Giordano telling Molesphini that NRF was one of the match's "biggest sponsors." Molesphini was suitably impressed that NRF generated enough revenue to sponsor a high-profile boxing match at a major arena. If he had any doubts before, the night at Barclays Center convinced Molesphini that Giordano was a successful businessman.

33.     By the summer of 2015, having spent a year emotionally manipulating Molesphini into seeing him as a friend, and having flashed enough signs of his business success and savvy, Giordano started discussing possible "investments." Already in the late spring of 2015, Giordano had told Molesphini that he was starting a nutritional supplement company to produce all-natural supplements that would be marketed to fitness-oriented customers.

34.     Giordano knew that this venture would be of interest to Molesphini, who had told Giordano that he was a fitness aficionado who spent much time working out in the gym. And crucially, Giordano knew that Molesphini had savings he could invest in the venture.

35.     Molesphini was indeed excited by this project, not least because Giordano appeared to share his belief that the market was in need of a line of all-natural supplements, distinct from the typical chemical-laced offerings populating store shelves.

36.     In June 2015, after the event at Barclays Center, Giordano informed Molesphini

that the new venture would operate through a New Jersey LLC he registered, called Nue-Trition

Weight Management, LLC ("Nue-Trition"), of which he was a managing member.  The name

was a play on the name of Nüe Resource Funding, LLC.

### Giordano Fraudulently Induces Molesphini to Invest in Nue-Trition Weight Management, LLC

37.     Giordano explained the contours of the new business.  First, Giordano represented

that he had secured a deal with Reliance Private Label Supplements ("Reliance"), a manufacturer

located in Edison, New Jersey, to manufacture the product.

38.     Second, Giordano assured Molesphini that he had a solid plan to effectively

market and sell the product.  Giordano told Molesphini that his brother Louis Giordano, another

member of Nue-Trition, and its co-manager, was involved in managing prominent martial arts

fighters, and was a nutritionist by training.  With Louis on board, these fighters, themselves

influential and well-known figures in fitness circles, would be natural customers for, and

promoters of this new product.

39.     Third, more generally, Giordano reiterated that he was a wealthy entrepreneur

with a successful track record, that was bound to be a reliable and competent manager of Nue-

Trition, and could be entrusted to properly manage investments in the business.

40.     In July 2015, Giordano asked Molesphini to invest $175,000 in Nue-Trition, in

return for a "10 percent stake" in the LLC.  Molesphini at first balked at the size of the request

and demanded an explanation for why such significant amount was needed.

41.     In response, in early July 2015, to induce Molesphini to invest this amount,

Giordano explicitly and unequivocally promised that the $175,000 was needed, and would be

used in its entirety, to fund the significant upfront costs associated with the launch of Nue-

Trition's product, including the costs of manufacturing a first batch of the supplement at

Reliance, and the costs of building a complicated website with e-commerce capabilities.

42.     To further reassure Molesphini that the $175,000 would be used entirely to fund the new venture's "startup costs," Giordano made clear that, as CEO of Nue-Trition, he would collect no salary until Nue-Trition turned a profit.  Thus, in multiple phone conversations with Molesphini in early July 2015, Giordano made clear that no part of the $175,000 would be used for his personal, non-business expenses.  And Molesphini had no reason to believe that Giordano would appropriate any of the $175,000 for his own use, given that he already derived apparently substantial income from his profitable mortgage lending business.

43.     This promise – that the $175,000 would be used to fund Nue-Trition – was communicated by Giordano on multiple occasions, over multiple phone calls with Molesphini, in early July 2015.

44.     On the strength of these promises that the $175,000 would be used, in its entirety, to fund what appeared to be a promising venture, Molesphini agreed to invest funds in Nue-Trition.  On July 18, 2015, Molesphini made out a certified check to NRF, as per Giordano's instructions.  On that same day, Giordano's driver picked up and drove Molesphini to meet Giordano at the Trump National Golf Club in Colts Neck, New Jersey (the "Trump Club"), where Giordano was a member.

45.     At the Trump Club, Molesphini handed Giordano the check for $175,000 made out to NRF, as instructed by Giordano.  In return, Giordano handed to Molesphini for his signature a so-called Stock Sale and Purchase Agreement (the "2015 Agreement"), prepared by Giordano's lawyers, and emailed to Molesphini the day before, pursuant to which Molesphini acquired 90 shares of "common stock" of Nue-Trition from NRF, a "shareholder" in Nue-Trition, in return for his payment of $175,000.

46.     Further, the day before the meeting at the Trump Club, Giordano emailed

Molesphini a copy of Nue-Trition's Operating Agreement.  Although the Operating Agreement

listed Molesphini as holder of a nine percent membership interest in Nue-Trition, the agreement

vested all management rights in Giordano and his brother Louis, another member of the LLC,

with the two enjoying "full and complete authority and power to manage and control the

business, investment, or other activities and affairs and property of" Nue-Trition.  Molesphini

had no management rights under the terms of the Operating Agreement.

47.     Trusting Giordano, upon information and belief, Molesphini signed the 2015

Agreement on the spot.  And, as evidenced by the Operating Agreement sent to Molesphini the

day before, Molesphini obtained a nine percent membership interest in Nue-Trition, with

Giordano holding a majority interest of 51 percent.

48.     Unbeknownst to Molesphini, who has no background in the law, Nue-Trition was

an LLC and thus could not, strictly speaking, offer "shares" for sale.

49.     Molesphini did not think it strange that Giordano had him make out a check

payable to NRF and not Nue-Trition.  That is because, at the Trump Club, Giordano assured

Molesphini that, as the principal of NRF, Molesphini's payment to NRF was a "formality"

necessary for "tax reasons" and was in practice, and under the terms of their understanding, "no

different from" an investment directly in Nue-Trition.  At the Trump Club meeting, before

Molesphini signed the 2015 Agreement, Giordano promised, once again, that he would

immediately redirect any monies paid to NRF into Nue-Trition.

50.     Any other arrangement would make no sense, in light of all circumstances.  After

all, in connection with the $175,000 investment, Molesphini was made a member of Nue-Trition.

51.     Further, in June-July 2015, it was understood that Molesphini had no interest in

investing in NRF, but every interest in investing in Nue-Trition. Molesphini has no familiarity with mortgage lending or NRF's business, but was a fitness buff familiar with the fitness industry.

52.     And, Giordano never claimed that NRF was in need of any funds. To the contrary, Giordano touted NRF's success, while stressing that it was Nue-Trition, a promising venture but still a startup, that was in need of capital from the likes of Molesphini.

### *Giordano Diverts Molesphini's $175,000 Investment into his Personal Accounts and Spends the Money on Nightclub Outings and his Girlfriend*

53.     Upon information and belief, within days after NRF received Molesphini's payment of $175,000, Giordano, in violation of repeated promises made to Molesphini, but in keeping with his true intentions that he maintained while making the promises to Molesphini, diverted the entirety of the $175,000 to his personal accounts, instead of directing them to Nue-Trition.

54.     Had Molesphini been aware of the truth -- that Giordano intended to and would divert the $175,000 investment into accounts under his control, instead of transferring them to the control of Nue-Trition or otherwise using them to fund Nue-Trition's operations, he would never have entered into the 2015 Agreement or transferred $175,000 to NRF.

55.     In control of the $175,000, Giordano did what he all along intended to do -- he went on a spending spree, continuing the kind of high-rolling lifestyle that he was already leading, but this time, at the expense of Molesphini. Had Molesphini been aware that Giordano intended to and would use his $175,000 investment for personal purposes, instead of using it to fund the operations of Nue-Trition, he would have never entered into the 2015 Agreement or transferred $175,000 to NRF.

56.     Shortly after he invested in Nue-Trition, in the summer of 2015, after a

disagreement with the club's management, Molesphini stopped working at 1 OAK . Giordano, always playing the role of the devoted friend as well as business partner, took Molesphini's side and vowed that, with Molesphini gone, he would never "spend a cent" at 1 OAK again.

57.     Nevertheless, now that he was enriched by the $175,000 paid by Molesphini, and seeking to continue his hedonistic habits, Giordano asked Molesphini to arrange for access at another nightclub comparable in exclusivity to 1 OAK.

58.     Accommodating this request from a person he considered his friend, Molesphini introduced Giordano to the management of Avenue, another exclusive, pricey nightclub located in the Meatpacking District of Manhattan.  In 2015, Giordano became a regular at that establishment.  As Molesphini later learned, Giordano began frequenting Avenue on a weekly basis, and began dating Jade Turner, a waitress at Avenue.

59.     Each time, Giordano would insist on paying the tab for all his guests, which would typically total $3,000-$5,000.  These sums exceeded what Giordano had been recently spending at 1 OAK, and were all the more incredible given that Giordano never drank alcohol and yet purchased exorbitantly-priced bottles of liquor for his guests' consumption. Unbeknownst to Molesphini, his investment was funding these spending sprees.  And as was also unknown at the time to Molesphini, all the while Giordano was duping at least two other unwitting persons into investing in Nue-Trition on false and fraudulent pretenses.

60.     A year later, in 2016, Molesphini discovered yet another fact suggesting that Giordano was living extravagantly.  At the time, he learned that Giordano, instead of residing exclusively in New Jersey, was renting an expensive apartment in the Chelsea area of Manhattan for his personal use.

61.     At one point, Molesphini asked Giordano why he was so generous with his

13

spending at Avenue. Giordano's reply was designed both to endear himself to Molesphini and to impress him with Giordano's Horatio Alger success story. Giordano replied that he spent such significant sums at Avenue because he was in love with Turner, and because he never had a chance to go out when he was younger, as he had been so busy furthering his career. Not a word was uttered about the source of the money he was spending. Impressed, Molesphini did not bother pressing the issue.

### *Giordano Fraudulently Induces Molesphini to Invest an Additional $234,600 and Diverts the Funds into His Personal Accounts*

62.     All the while, Giordano utterly failed to devote any time or financial resources into developing Nue-Trition into a functioning business.

63.      During the fall of 2015, Molesphini was regularly calling and sending text messages to Giordano, seeking information about Nue-Trition. Each time, in response, Giordano would assure Molesphini that he was "working" on the business, that Reliance was "gearing up" its manufacture of the product, and that the entirety of Molesphini's $175,000 investment was being used to fund Nue-Trition's operations while the venture had yet to make a profit.

64.     In what became a pattern of behavior designed to disguise his fraudulent behavior, Giordano took minor steps, simulating business activity, meant to lull Molesphini into believing that the business was being successfully developed. Thus, in or about August 2015, Giordano purportedly retained several individuals – including Pietro Sferrazza, Paul Malignaggi, and the fashion supermodel Tyson Beckford – on a pure commission basis, to carry out certain marketing activities for Nue-Trition as the company's so-called "brand ambassadors." Although these "ambassadors" subsequently did nothing in furtherance of their duties, at the time, their "retention" served to convince Molesphini that Giordano was in fact actively involved in Nue-Trition's affairs.

14

65.     Further, in the late summer and fall of 2015, Giordano continued regularly meeting with Molesphini at The Palm steakhouse in Tribeca.  During these meetings, Giordano reassured and promised to Molesphini that he was fully committed to Nue-Trition, and that the entirety of Molesphini's $175,000 investment was being spent and would continue to be spent on developing Nue-Trition's business and operations, including the building of a website and the manufacture of Nue-Trition's products at Reliance.

66.     These statements were knowingly false at the time they were made.  Giordano made these misrepresentations to induce Molesphini to turn over additional monies to Giordano or to entities controlled by him.

67.     At no point during these meetings did Giordano reveal that all or substantially all of Molesphini's $175,000 investment had been diverted into accounts controlled by Giordano, or that he was using these funds – even in part – to fund his lifestyle, and not on Nue-Trition. Instead, he repeatedly represented to Molesphini that, as managing member, he was taking "no salary," and would "draw no profit" until Nue-Trition was profitable.  Giordano made clear that he could afford to agree to this arrangement, given the substantial amounts he was making as owner and principal of NRF.

68.     In the fall of 2015, Giordano called Molesphini to complain about Kizenko, Giordano's partner in NRF whom Molesphini met at Barclays Center.  Giordano told Molesphini that he had a falling out with Kizenko, wanted to "buy him out," and offered Molesphini an unspecified interest in NRF, in return for a payment of $250,000.  Giordano further assured Molesphini that NRF would be sold in "less than three years," allowing Molesphini to make a quick profit from this investment.

69.     Molesphini was taken aback, and said that he had no interest in investing in NRF.

However, Giordano kept pressing Molesphini to commit the funds.

70.     Molesphini was ultimately swayed into committing the funds by Giordano's inducements and false representations -- and by the sense of trust that they continued to engender -- including that Giordano was actively developing Nue-Trition's business and was and would be spending the entirety of Molesphini's $175,000 investment on growing its operations.

71.     On or about January 5, 2016, Molesphini entered into a Stock Sale and Purchase Agreement (the "2016 Agreement"), thinking that he was purchasing an interest in NRF.  The 2016 Agreement was entered into between Plaintiff Elephant Entertainment Inc. ("EEI"), an entity wholly owned by Molesphini, and NRF.  Contrary to the verbal understanding reached between Molesphini and Giordano that this additional investment would "buy out" Kizenko's interest in NRF, under the terms of the 2016 Agreement, Molesphini (via EEI) paid a total of $234,600 to NRF in return for a grant of 151 "shares" of Nue-Trition, and in return for an interest in 1.5 percent of the proceeds of any sale of NRF.  Although the 2016 Agreement referenced a payment of $234,600 to NRF, Giordano – eager to get access to his "friend's" funds on fraudulent grounds – was willing to "waive" payment of the balance and accepted $234,600 of Molesphini's funds.  These funds were paid in several installments over 2016-2017.

72.     Had Plaintiffs known the truth about Giordano's misrepresentations made in the late summer and fall of 2015 at The Palm – that, instead of using Molesphini's $175,000 investment to fund Nue-Trition's operations, Giordano had diverted that investment into accounts controlled by him and was using it, at least in part, to fund his lifestyle – Plaintiff EEI would never have entered into the 2016 Agreement or would have paid $234,600 to NRF for additional shares of Nue-Trition.  Indeed, had Plaintiffs known that, in breach of representations made by Giordano, *any part* of Molesphini's $175,000 investment was diverted by Giordano, a

wealthy entrepreneur with more than enough income on which to live, into accounts controlled by Giordano to fund his lifestyle, EEI would not have paid $234,600 to NRF.

73.     Upon information and belief, as with the $175,000 investment, shortly after NRF received the payment of $234,600 from EEI, Giordano transferred all or substantially all of the $234,600 into his personal accounts, for his personal use.

74.     Enriched by this substantial payment, Giordano continued his spending spree. From 2016 through 2019, Giordano continued his regular outings to expensive nightclubs, including Avenue, and adding Goldbar and Tao – other exclusive Manhattan nightclubs – to his list of preferred party and spending venues.

75.     Giordano's spending on his girlfriend Turner also increased, and as he revealed to Molesphini, he started taking her and her friends to fancy weekly dinners at high-end Manhattan restaurants, including Cipriani and Philippe Chow.  As ever, Giordano would pay the bills of all his guests at these establishments – with funds fraudulently obtained from Molesphini.  In addition, Giordano used Molesphini's funds to fund expensive pleasure trips with Turner, including trips to Las Vegas and to Miami, where he stayed at the exclusive Fontainebleau Hotel.

### *Having Fraudulently Obtained $409,600 from Molesphini, Giordano Utterly Fails to Devote any Effort into Developing or Running Nue-Trition*

76.     In the meantime, Nue-Trition was not being developed with any due speed. Despite Molesphini's frequent requests, Giordano failed to provide Molesphini with information about the finances or operations of Nue-Trition, or with any information about his alleged contacts at Reliance, Nue-Trition's product manufacturer.

77.     No record of Molesphini's investments was ever provided.  Molesphini never received a K-1 or any other tax document evidencing his investment in, and interest in Nue-Trition.  No explanation was ever provided as to how the monies invested by Giordano were

being spent.  No financials or any books and records of Nue-Trition were ever made available.

78.     Giordano did, however, take steps to lull Molesphini into thinking that business was progressing.  First, he would treat Molesphini to monthly dinners at The Palm steakhouse, during which Giordano would assure Molesphini that he was "working on it," that development of business "takes time," and asking Molesphini to be "patient."

79.     Second, shortly after the execution of the 2016 Agreement, Giordano provided Molesphini with the first sample container of product manufactured by Reliance, sporting a label with Nue-Trition's name.  Giordano explained that, until mass production begins, he would store all containers of product at NRF's offices in New Jersey.  Over the next 18 months, Molesphini received about eight such sample containers.  Each time, Giordano promised Molesphini that more would be manufactured in the near future.  With patience, Giordano promised, production would be ramped up and Nue-Trition's product would receive wide distribution.

80.     In 2016, Nue-Trition, which advertised on social media, sold about $600-$1,000 worth of product.  When customers would complain that they did not receive the product they ordered, Giordano would point the finger at Reliance.

81.     In reality, however, Giordano had no interest in investing funds in production.  He preferred to loot Nue-Trition's coffers, spending fraudulently obtained funds on his nightclub outings, on his girlfriend, and on luxury items for himself.

### Giordano Begins to Actively Avoid Molesphini and Concocts Ever More Elaborate Excuses for His Failures

82.     By this time, in late 2016, it became apparent to Molesphini that little to no progress was being made on developing and growing Nue-Trition's operations.  The company still had no working website, even though e-commerce was supposed to be its primary source of revenue.  Little to no product was being manufactured.  The company's "ambassadors" were

inactive for lack of any product to market.  No contracts had been executed with any gyms or other retail outlets.  In short, nearly a year after Molesphini had invested $409,600 into Nue-Trition, the company remained little more than a business plan and the subject of Giordano's ongoing boasts and promises of future riches.

83.     Nevertheless, Molesphini was not willing to initiate an open conflict with Giordano.  For one, he still trusted Giordano to at least ensure that Nue-Trition's supplement would be manufactured in large numbers in the near future.  More importantly, Molesphini felt that, with $409,600 of his funds at Giordano's mercy, a conflict with Giordano would not be to his advantage, if he wanted to realize any sort of return on his investment.

84.     By the fall of 2016, having drained Molesphini of funds, and while continuing to visit Manhattan on a weekly basis, Giordano started actively avoiding Molesphini.  From 2016 through 2019, Giordano used an ever-changing set of "excuses" – all pointing to various purported unfortunate circumstances – to explain his inaction on Nue-Trition and his newly found inability to meet and confer with Molesphini.

85.     On at least three occasions, Giordano cancelled scheduled meetings with Molesphini as a result of a "flat tire."  Numerous times, Giordano claimed that he could not work on Nue-Trition because he was "sick."  At various times, he told Molesphini that he could not dedicate the necessary time to Nue-Trition because his car "was stolen out of his driveway", his "grandfather was dying," and that he had gotten into several "bad car accidents."

86.     At one point, in the course of one week in October 2016, Giordano claimed that he could not meet with Molesphini to discuss Nue-Trition's ongoing business because of an incredible string of near-simultaneous tragedies: a) the death of his cousin; b) the death of his uncle; c) his grandfather's hospitalization; and d) Giordano's "seizure" caused by a purported

"brain abnormality."

87.     Yet Giordano kept living the high life, fueled, upon information and belief, with Molesphini's investment – and, as Plaintiff later learned, with the investments made by at least two other defrauded individuals.

88.     In 2016, during the few times that Molesphini met with him, Giordano was seen wearing a new gold chain, as well as fancy Rolex and Hublot watches.  Another time in 2017, instead of showing up to a meeting with Molesphini to discuss business, Giordano called him at the last minute to invite Molesphini to a concert featuring the band The Weeknd [sic] at Barclays Center that he was attending with his girlfriend and her friends.  Seizing the opportunity to at least meet and buttonhole Giordano, Molesphini attended the concert, and was amazed to find out that Giordano paid for his numerous guests' tickets and that the seats were located in an expensive suite at the arena.  Molesphini later learned that Giordano spent $12,000 on this concert alone.

89.     In the summer of 2017, Molesphini began to strongly suspect that he was a victim of a fraudulent scheme.  That year, Giordano had introduced him to a woman named Annie Leonard, a jeweler in Red Bank, New Jersey, near NRF's offices, to assist Molesphini with the purchase of an engagement ring for his fiancée.

90.     While visiting Molesphini at his apartment, Leonard immediately noticed a labeled container of Nue-Trition's product.  To Molesphini's shock, Leonard then revealed that she and her mother had invested $200,000 in Nue-Trition, that she had received no information about the company since her investment, and had not been returned any part of her investment.

91.     After Molesphini confronted Giordano about Leonard's investment, he became defensive, told him that Leonard's investment "does not concern" Molesphini, but promised to

provide Nue-Trition's profit and loss statements and other financial documents. Nothing of the sort was ever provided, despite Giordano's promises.

### Giordano Announces that He is Effectively Shutting Down Nue-Trition's Operations Due to Purported Personal Problems

92.     On November 8, 2017, Molesphini received a mass email from Giordano, addressed to various undisclosed persons, addressing Giordano's latest period of absence.

93.     Giordano claimed, in trademark fashion, that in recent days, he had "to deal with things with my two sons that I hope none of you ever have to." Further, his grandfather was "in the ER" (as before, in 2016) and had "gone blind totally in one eye." To attend to these allegedly pressing family matters, Giordano announced that he would "be away" from his business affairs for an "indefinite" period.

94.     To assuage his recipients' concerns, Giordano assured that for businesses, like Nue-Trition, in which investments were made but that "have not yet generated any revenue or profit," a "full reimbursement" of investment would be forthcoming, "plus 10% interest on that money[,] so no one has to feel like their money has just sat somewhere and didn't earn anything."

95.     Upon information and belief, Molesphini's investment monies did not, in fact, "sit somewhere," but were instead spent by Giordano on his lifestyle.

96.     Molesphini's hopes of a return on his investment were quickly dashed. Not a cent was returned, and no further information about Nue-Trition's (or NRF's) affairs was ever provided.

97.     Further, despite Giordano's promises made at the time of Molesphini's investment of $234,600 that NRF would be sold "within three years" and that Molesphini would be entitled to a portion of the proceeds, no such sale ever took place.

98.     Around Christmas 2017, Giordano promised to Molesphini that he had found a major India-based investor for NRF, and that Molesphini would be paid with the proceeds of that deal.  Promises that the purported "deal" was about to "close" were forthcoming throughout 2018.  However, by early 2019, the purported deal had not yet finalized.  At around that time, Giordano completely stopped responding to Molesphini's messages.

### *Molesphini Discovers Clear Confirmation of Giordano's Fraud*

99.     In early 2019, Molesphini spoke with a representative of Reliance.  When asked about whether Nue-Trition's product was still being manufactured, he told Molesphini that the Nue-Trition account was "briefly" opened a "few years ago," that a "single" batch of the product was manufactured, but that Giordano never paid Reliance for this batch, and the account was closed for non-payment two years ago.

100.    And, as if he needed additional proof of Giordano's fraud, in November 2019, Molesphini met Sokie Shehu – another acquaintance of Giordano – who told him that she had been defrauded of her $50,000 investment in Nue-Trition under similar circumstances.

101.    To Molesphini, this news further confirmed what he already realized – that, instead of investing the $175,000 (or the $234,600) provided by Molesphini to ramp up production of Nue-Trition's product, Giordano had absconded with the investment, using it for his personal purposes and utterly failing to carry out his duties as CEO of Nue-Trition.

102.    All the while, Molesphini was going through a financial meltdown.  With revenue from his investment in the Manhattan restaurant decreasing, and with his savings depleted after his $409,600 investment, Molesphini has been devastated financially and personally.

103.    As of today, Molesphini has received no part of his $409,600 investment.  Nue-Trition has, for all purposes, ceased operations, and NRF was never sold, despite Giordano's

promises.  And Giordano, having absconded with Molesphini's investment, remains unreachable.

**DEMAND FUTILITY**

104.    Pursuant to N.J.S.A. 42:2C-68, Molesphini, a member of Nue-Trition, a New

Jersey LLC, may assert certain causes of action as derivative claims because a pre-suit demand

on the members would be futile.

105.    It would be futile for Molesphini to seek consent to bring a lawsuit on behalf of

Nue-Trition from a majority of the LLC's managers because Nue-Trition has only two managers

– Defendant Anthony Giordano and Louis Giordano – and Defendant Anthony Giordano, the

person who committed the wrongdoings asserted here, therefore constituted 50 percent of the

management.  Further, Defendant Giordano held 51 percent of the LLC's membership interests.

106.    This action is not a collusive one to confer jurisdiction that the Court would

otherwise lack.

**COUNT ONE**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

107.    Plaintiffs re-allege and incorporate by reference the allegations set forth in all of

the preceding paragraphs as if fully set forth herein.

108.    Defendants had a duty to be truthful in providing material facts to Plaintiffs in

connection with their efforts to solicit Plaintiffs to invest in Nue-Trition.

109.    In order to induce Plaintiffs to invest in Nue-Trition, Defendants made numerous

untrue representations of fact which they knew to be untrue.

110.    Among other false promises, in dinners at The Palm steakhouse in Manhattan in

June 2015, during numerous phone calls in June-July 2015, and finally at the Trump Club in July

2015, to induce Molesphini to enter into the 2015 Agreement and invest $175,000 in Nue-

Trition, Giordano, on behalf of himself and of NRF, explicitly promised to Molesphini that: (i)

23

the entirety of the $175,000 to be paid by Molesphini to NRF under the proposed terms of the

2015 Agreement would be transferred to Nue-Trition's accounts; and (ii) the $175,000 to be

invested by Molesphini would be used in its entirety to fund the costs associated with the launch

of Nue-Trition's product, including the costs of manufacturing a first batch of the supplement,

the costs of developing the company's website, and the costs of marketing the product.

111.    Reassuring Molesphini that the $175,000 would be used entirely to fund the new

venture's "startup costs," Giordano made clear that, as CEO of Nue-Trition, he would collect no

salary, while devoting significant time to his duties, until Nue-Trition turned a profit.

112.    At the time that Giordano made these promises to Molesphini, on behalf of

himself and of NRF, to induce Molesphini to enter into the 2015 Agreement, he had no intention

of keeping them.

113.    Upon information and belief, within days after NRF received Molesphini's

payment of $175,000, Giordano and NRF, in violation of repeated promises made to Molesphini,

but in keeping with Giordano's true intentions that he maintained while making the promises to

Molesphini, diverted all or substantially all of the $175,000 to Giordano's personal accounts,

instead of directing them to Nue-Trition.

114.    In violation of his promises to Molesphini, Giordano went on to use all or

substantially all of the $175,000 invested by Molesphini to pay his personal expenses entirely

unrelated to Nue-Trition, spending the money on nightclub outings, dinners, watches and other

luxury items, apartments, and on his girlfriend, Jade Turner.

115.    Further, in the late summer and fall of 2015, to induce Plaintiffs EEI and

Molesphini to enter into the 2016 Agreement and invest an additional $234,600 in Nue-Trition,

Giordano on behalf of himself and NRF, over monthly dinners at The Palm steakhouse in

Tribeca, assured Molesphini that he was fully committed to Nue-Trition, and that the entirety of Molesphini's $175,000 investment was being then spent on developing Nue-Trition's business and operations, including the building of a website and the manufacture of Nue-Trition's products at Reliance.

116.    These representations were knowingly false at the time they were made.

117.    At no point during these meetings did Giordano reveal the truth -- that all or substantially all of Molesphini's $175,000 investment had been diverted by Defendants into accounts controlled by Giordano, or that Defendants were using all or substantially all of these funds to fund Giordano's lifestyle, and not on Nue-Trition.

118.    Upon information and belief, shortly after NRF received EEI's payment of $234,600, Giordano and NRF, diverted all or substantially all of the $234,600 to Giordano's personal accounts, instead of directing them to Nue-Trition.

119.    Had Plaintiffs known the truth – that, instead of using Molesphini's $175,000 investment to fund Nue-Trition's operations, Defendants had diverted all or substantially all of that investment into accounts controlled by Giordano and were using such funds, at least in part, to fund Giordano's lifestyle – Plaintiffs would never have entered into the 2016 Agreement or would have paid $234,600 to NRF.  Indeed, had Plaintiffs known that *any part* of the $175,000 investment was diverted by Giordano, a wealthy entrepreneur with more than enough income on which to live, into accounts controlled by Giordano to fund his lifestyle, they would not have paid $234,600 to NRF and purchased additional interests in Nue-Trition.

120.    The Defendants purposely offered the aforementioned misrepresentations of fact and of their present intentions for the sole purpose of deceiving Plaintiffs, so Plaintiffs would and ultimately did invest $409,600 in Nue-Trition, which was a vehicle for enrichment of Giordano,

and not a legitimate business operation.

121.    As the foreseeable and intended result of Defendants' material misstatements of the previously alleged facts upon which Plaintiffs relied, Plaintiffs invested $409,600 in Nue-Trition.  In so doing, Plaintiffs reasonably relied on Defendants' material misstatements of the previously alleged facts.

122.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' intentional and purposeful fraud, Plaintiffs have been injured in an amount to be determined at trial, but no less than $409,600, exclusive of interest and attorney's fees. As Defendants' actions were intentional and designed to deceive Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $5 million in punitive damages.

**COUNT TWO**

**Fraud in the Inducement Against all Defendants**

123.    Plaintiffs re-allege and incorporate by reference the allegations set forth in all of the preceding paragraphs as if fully set forth herein.

124.    Plaintiffs re-allege and incorporate by reference the allegations set forth in all of the preceding paragraphs as if fully set forth herein.

125.    In order to induce Plaintiffs to enter into the 2015 and the 2016 Agreements, Defendants made numerous untrue representations of fact which they knew to be untrue.

126.    Among other false promises, in dinners at The Palm steakhouse in Manhattan in June 2015, during numerous phone calls in June-July 2015, and in July 2015 at the Trump Club, to induce Molesphini to enter into the 2015 Agreement, Giordano, on behalf of himself and of NRF, explicitly promised to Molesphini that the entirety of the $175,000 to be paid by Molesphini to NRF under the proposed terms of the 2015 Agreement would: (i) be transferred to

Nue-Trition's accounts; and (ii) be used in its entirety to fund the costs associated with the launch of Nue-Trition's product, including costs of manufacturing a first batch of supplement, the costs of developing the company's website, and the costs of marketing the product.

127.    Reassuring Molesphini that the $175,000 would be used entirely to fund the new venture's "startup costs," Giordano made clear that, as CEO of Nue-Trition, he would collect no salary, while devoting significant time to his duties, until Nue-Trition turned a profit.

128.    At the time that Giordano made these promises to Molesphini, on behalf of himself and of NRF, to induce Molesphini to enter into the 2015 Agreement, he had no intention of keeping them.

129.    Upon information and belief, within days after NRF received Molesphini's payment of $175,000, Giordano and NRF, in violation of repeated promises made to Molesphini, but in keeping with Giordano's true intentions that he maintained while making the promises to Molesphini, diverted all or substantially all of the $175,000 to Giordano's personal accounts, instead of directing them to Nue-Trition.

130.    In violation of his promises to Molesphini, Defendants went on to use all or substantially all of the $175,000 invested by Molesphini to pay Giordano's personal expenses entirely unrelated to Nue-Trition, spending the money on nightclub outings, dinners, and other luxury items, apartments, pleasure trips to Las Vegas and Miami, and on Giordano's girlfriend, Jade Turner.

131.    Further, in the late summer and fall of 2015, to induce Plaintiffs EEI and Molesphini to enter into the 2016 Agreement and invest $234,600 in Nue-Trition, Giordano on behalf of himself and NRF, over monthly dinners at The Palm steakhouse in Tribeca, assured Molesphini that Giordano was fully committed to Nue-Trition, and that the entirety of

Molesphini's $175,000 investment was being spent on developing Nue-Trition's business and operations, including the building of a website and the manufacture of Nue-Trition's products at Reliance.

132.    These representations were knowingly false at the time they were made.

133.    At no point during these meetings did Giordano reveal the truth -- that all or substantially all of Molesphini's $175,000 investment had been diverted into accounts controlled by Giordano, or that Giordano was using all or substantially all of these funds to fund his lifestyle, and not on Nue-Trition.

134.    Upon information and belief, shortly after NRF received EEI's payment of $234,600 under the 2016 Agreement, Giordano and NRF, diverted the entirety of the $234,600 to Giordano's personal accounts, instead of directing them to Nue-Trition.

135.    Had Plaintiffs known the truth – that, instead of using Molesphini's $175,000 investment to fund Nue-Trition's operations, Defendant had diverted all or substantially all of that investment into accounts controlled by Giordano and were using it, at least in part, to fund Giordano's lifestyle – Plaintiffs would never have entered into the 2016 Agreement or would have paid $234,600 to NRF.  Indeed, had Plaintiffs known that *any part* of the $175,000 investment was diverted by Giordano, a wealthy entrepreneur with more than enough income on which to live, into accounts controlled by Giordano to fund his lifestyle, they would not have paid $234,600 to NRF.

136.    As the foreseeable and intended result of Defendants' material misstatements of the previously alleged facts upon which Plaintiffs reasonably relied, Plaintiffs have been damaged in an amount to be determined at trial, but no less than $409,600.

## COUNT THREE

**Breach of Fiduciary Duty**
**(Plaintiff Molesphini, Derivatively on Behalf of Nue-Trition, Against Giordano)**

137.    Plaintiff Molesphini repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

138.    Giordano, as CEO of Nue-Trition and as its managing member, owes other members of the LLC, including Molesphini, the utmost fiduciary duties of due care, good faith, and loyalty.

139.    In violation of those duties, Giordano utterly failed to develop the business of Nue-Trition, to the detriment of the LLC and its members, including Molesphini.

140.    Giordano had an obligation to dedicate the $409,600 invested by Plaintiffs into Nue-Trition for purposes related to its business.

141.    Instead, Giordano fraudulently diverted all or substantially all of the $409,600 invested by Plaintiffs to pay his personal expenses entirely unrelated to Nue-Trition, spending the money on nightclub outings, dinners, watches and other luxury items, apartments, and on his girlfriend, Jade Turner.

142.    Among other things, Giordano utterly failed, despite having access to significant funds, to fund the manufacture of Nue-Trition's product, as evidenced by his complete failure to pay Reliance.

143.    As a result of the foregoing, Giordano has breached his fiduciary duties to Nue-Trition and its members, including the obligations of loyalty, good faith, fair dealing, and due care, causing harm to Molesphini as member of Nue-Trition.

144.    As a direct and proximate result of Giordano's breach of his fiduciary duties, Nue-Trition's members have suffered damages in an amount to be determined at trial.

## COUNT FOUR

### Promissory Estoppel Against All Defendants

145.    Plaintiffs re-allege and incorporate by reference the allegations set forth in all of the preceding paragraphs as if fully set forth herein.

146.    In order to induce Plaintiffs to enter into the 2015 and the 2016 Agreements, Defendants made numerous untrue representations of fact which they knew to be untrue.

147.    Among other false promises, in dinners at The Palm steakhouse in Manhattan in June 2015, and during numerous phone calls in June-July 2015, to induce Molesphini to enter into the 2015 Agreement, Giordano, on behalf of himself and of NRF, explicitly promised to Molesphini that the entirety of the $175,000 to be paid by Molesphini to NRF under the proposed terms of the 2015 Agreement would be: (i) transferred to Nue-Trition's accounts; and (ii) used in its entirety to fund the costs associated with the launch of Nue-Trition's product, including the costs of manufacturing a first batch of the supplement, the costs of developing the company's website, and the costs of marketing the product.

148.    Reassuring Molesphini that the $175,000 would be used entirely to fund the new venture's "startup costs," Defendants made clear that Giordano, as CEO of Nue-Trition, would collect no salary, while devoting significant time to his duties, until Nue-Trition turned a profit.

149.    At the time that Giordano made these promises to Molesphini, on behalf of himself and of NRF, to induce Molesphini to enter into the 2015 Agreement, he had no intention of keeping them.

150.    Upon information and belief, within days after NRF received Molesphini's payment of $175,000, Giordano and NRF, in violation of repeated promises made to Molesphini, but in keeping with Giordano's true intentions that he maintained while making the promises to Molesphini, diverted all or substantially all of the $175,000 to Giordano's personal accounts,

instead of directing them to Nue-Trition.

151.    In violation of his promises to Molesphini, Giordano went on to use all or substantially all of the $175,000 invested by Molesphini to pay his personal expenses entirely unrelated to Nue-Trition, spending the money on nightclub outings, dinners, watches and other luxury items, apartments, and on his girlfriend, Jade Turner.

152.    Further, in the late summer and fall of 2015, to induce Plaintiffs EEI and Molesphini to enter into the 2016 Agreement, Giordano on behalf of himself and NRF, over monthly dinners at The Palm steakhouse in Tribeca, assured Molesphini that he was fully committed to Nue-Trition, and unequivocally promised that the entirety of Molesphini's $175,000 investment was being spent and would continue to be spent on developing Nue-Trition's business and operations, including the building of a website and the manufacture of Nue-Trition's products at Reliance.

153.    These representations and promises were knowingly false at the time they were made.

154.    Defendants made these promises and representations with the expectation that Plaintiffs would rely on these promises and representations.

155.    Reasonably relying on these promises, Plaintiffs paid an additional $234,600 to NRF.

156.    Upon information and belief, shortly after NRF received the payment of $234,600, Giordano and NRF diverted all or substantially all of the $234,600 to Giordano's personal accounts, instead of directing them to Nue-Trition.

157.    In violation of their promises to Plaintiffs, Defendants went on to use all or substantially all of the $409,600 invested by Plaintiffs to pay Giordano's personal expenses

entirely unrelated to Nue-Trition, spending the money on nightclub outings, dinners, watches and other luxury items, apartments, and on his girlfriend, Jade Turner.

158.    Plaintiffs have suffered a detriment of a definite and substantial nature in reliance on Defendants' promises in an amount to be determined at trial, but no less than $409,600.

**WHEREFORE**, it is respectfully requested that the Court award:

(a)     Compensatory damages in favor of Plaintiffs in an amount to be determined at trial, but no less than $409,600;

(b)     Punitive damages in favor of Plaintiffs in an amount to be determined at trial, but no less than $5,000,000;

(c)     Costs, interest, and attorney's fees; and

(d)     Such other and further relief as this Court may deem just and proper.

DATED:  July 14, 2020
            New York, New York

LAW OFFICE OF ALEXANDER SAKIN, LLC

/s/ Alexander Sakin
_____
Alexander Sakin
80 Broad St., Suite 703
New York, NY 10004
(646) 790-3108

*Attorney for Plaintiffs*

## **VERIFICATION**

I, Craig Molesphini, am a Plaintiff herein.  I have read the foregoing complaint and know the contents thereof.  The allegations of the complaint are true of my personal knowledge, except as to the matters therein alleged on information and belief, and as to those matters, I believe them to be true.

I declare and verify under penalty of perjury that the foregoing is true and correct. Executed on July 14, 2020.

Craig Molesphini