UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CRAIG MOLESPHINI and ELEPHANT ENTERTAINMENT, INC.,

Plaintiffs,

-v.-

ANTHONY GIORDANO,

Defendant.

20 Civ. 5427 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Craig Molesphini and Elephant Entertainment, Inc. — Mr. Molesphini's closely-held corporation (collectively, "Molesphini") — sued Defendant Anthony Giordano for swindling Mr. Molesphini out of nearly his entire life savings. Through fancy dinners, a night out at a professional boxing match, and tales of an underdog story evoking Mr. Molesphini's own rise from humble beginnings, Mr. Giordano played a multiyear con, duping Mr. Molesphini into believing that he was a successful businessman and, moreover, Mr. Molesphini's friend. Preying on Mr. Molesphini's trust, Mr. Giordano convinced him to invest almost a half million dollars in a bogus nutrition supplement company, Nue-Trition Weight Management, LLC. But eventually Mr. Molesphini discovered the fraud and sued Mr. Giordano in this Court. Criminal authorities later interceded, however, and this case was stayed while Mr. Giordano's criminal case unfolded. The criminal case has now resolved, clearing the way for Mr. Molesphini's civil suit to proceed — which asserts claims for securities fraud, fraudulent inducement, breach of fiduciary duty, and promissory estoppel. Before the Court is Mr. Giordano's motion to dismiss

the Second Amended Complaint ("SAC" (Dkt. #85)) pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court grants in part and denies in part Mr. Giordano's motion.

## BACKGROUND[1]

### A. Factual Background

#### 1. Mr. Giordano Meets Mr. Molesphini and Lays the Groundwork for His Fraudulent Scheme

Mr. Molesphini met Mr. Giordano in 2014 while working as a doorman at a Manhattan nightclub, 1 OAK. (SAC ¶¶ 1, 17). At the time, Mr. Molesphini was 34 years old, living by himself in "a small, rented walk-up apartment in a prewar building in Manhattan, and rel[ying] substantially on his salary as a doorman at 1 OAK." (*Id.* ¶¶ 14, 17). Mr. Molesphini was a self-made, working man: "He had grown up on Long Island in difficult financial and personal circumstances, becoming estranged from his family in high school." (*Id.* ¶ 15). He left home at age 18, attended and graduated college, and moved to Manhattan to make a life for himself. (*Id.*).

"Over the years, through hard work, [Mr. Molesphini] was able to save several thousand dollars. And through the friendships he formed in the nightlife industry, [he] was able to invest those funds in what turned into a successful Manhattan restaurant." (SAC ¶ 16). Around the time he met Mr.

[1] This Opinion draws its facts from the SAC, the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). For ease of reference, the Court refers to Defendant's memorandum of law in support of his motion to dismiss as "Def. Br." (Dkt. #99); to Plaintiffs' memorandum of law in opposition to Defendant's motion as "Pl. Opp." (Dkt. #101); and to Defendant's reply memorandum of law as "Def. Reply" (Dkt. #102).

Giordano, Mr. Molesphini also "expected to receive a sizeable settlement from a personal injury lawsuit he had filed in connection with an injury sustained on the job at 1 OAK." (*Id.* ¶ 23). So, with some money to his name, plus an interest in "athletic[s] and fitness[ ]," Mr. Molesphini "presented the perfect target" for Mr. Giordano's Nue-Trition scheme. (*Id.* ¶ 16).

Mr. Giordano entered Mr. Molesphini's life when, as a favor to a friend, Mr. Molesphini helped Mr. Giordano get into 1 OAK to entertain some clients. (SAC ¶¶ 19-20). Leveraging his newfound inside man, Mr. Giordano began frequenting 1 OAK weekly — each time spending $2,000 to $3,000 and socializing with Mr. Molesphini. (*Id.* ¶ 22). Soon Mr. Giordano learned of Mr. Molesphini's restaurant investment funds and forthcoming settlement money, and so he began "cultivating a relationship," "ingratiat[ing] himself with [Mr.] Molesphini" and trying to "impress him." (*Id.* ¶ 24). In addition to his frequent flashy visits to 1 OAK, Mr. Giordano began treating Mr. Molesphini to "regular dinners at The Palm steakhouse in Tribeca, a high-end restaurant." (*Id.*).

Through this cultivation campaign, Mr. Giordano portrayed himself as a kindred spirit. He "painted a picture of himself as someone who, like [Mr.] Molesphini, grew up in humble circumstances in the suburbs of New York City, was socially ostracized in his youth, and succeeded in business — and in life — despite numerous obstacles." (SAC ¶ 25). He also shared that a key part of his business portfolio was Nüe Resource, a successful mortgage lender headquartered in New Jersey that had 30 to 40 employees. (*Id.*).

In one of the more imaginative phases of his scheme, Mr. Giordano took Mr. Molesphini to an HBO-televised professional boxing match at Barclays Center in Brooklyn, featuring world champion boxer Miguel Cotto. (SAC ¶ 30). Mr. Giordano paid for the tickets (in the fifth row) and introduced Mr. Molesphini to Peter Kizenko, explaining that he was Mr. Giordano's partner in Nüe Resource and the former head of the equity trading desk at Goldman Sachs's Moscow office. (*Id.* ¶¶ 30-31). Mr. Giordano told Mr. Molesphini that Nüe Resource was one of the match's "biggest sponsors," and between each round the name "Nüe Resource Funding" flashed on the jumbotron above the ring. (*Id.* ¶ 32). This evening all but sealed the deal for Mr. Molesphini: "If he had any doubts before, the night at Barclays Center convinced [him] that [Mr.] Giordano was a successful businessman." (*Id.*). And more generally, Mr. Giordano's rags-to-riches narrative and opulent lifestyle achieved their intended effect: Mr. Molesphini was "greatly impressed" and came to "admire[ ]" Mr. Giordano, who became "a close friend and even a role model." (*Id.* ¶ 27).

### 2. Mr. Giordano Solicits the First Investment from Mr. Molesphini and Puts It Toward Personal Uses

It was in the late spring of 2015 that Mr. Giordano mentioned to Mr. Molesphini that he was starting an "all-natural" "nutritional supplement company." (SAC ¶ 33). By the summer of 2015, Mr. Giordano started discussing possible "investments." (*Id.*). Mr. Giordano said that his new venture would operate through a New Jersey LLC he had registered called Nue-

Trition Weight Management, LLC ("Nue-Trition") — a play on Mr. Giordano's Nüe Resource brand — and that he was "a managing member" of Nue-Trition. (*Id.* ¶ 36).

Mr. Giordano outlined the contours of the new business. *First*, he represented that he had secured a deal with Reliance Private Label Supplements ("Reliance"), a manufacturer located in Edison, New Jersey, to manufacture Nue-Trition's product. (SAC ¶ 37). *Second*, he detailed a plan to get the product off the ground: his brother, a nutritionist and the "co-manager" of Nue-Trition, was involved in managing prominent martial arts fighters and would recruit them as customers and promoters of the product. (*Id.* ¶ 38). *Third*, more generally, Mr. Giordano reiterated that he was a wealthy entrepreneur with a successful track record, that he was bound to be a reliable and competent manager of Nue-Trition, and that he could be entrusted to properly manage investments in the business. (*Id.* ¶ 39). Mr. Molesphini, "a fitness aficionado," was enthusiastic about the opportunity. (*Id.* ¶¶ 34-35).

On July 18, 2025, Mr. Molesphini made the first of two investments in Nue-Trition — this one for $175,000, in exchange for a nine percent stake in the LLC. (SAC ¶¶ 44, 46-47). Although Mr. Molesphini initially balked at the size of the investment, Mr. Giordano quelled his concerns by promising that the $175,000 was necessary to fund the significant upfront costs associated with the launch of Nue-Trition's product, including the costs of manufacturing a first batch of the supplement at Reliance and building a complicated website with e-commerce capabilities. (*Id.* ¶¶ 40-41). Mr. Giordano assured Mr.

Molesphini that as "CEO" of Nue-Trition, he would collect no salary until the business turned a profit. (*Id.* ¶ 42). And he made clear, repeatedly and on multiple occasions, that no part of the investment would be used for his personal, non-business expenses. (*Id.* ¶¶ 42-43).

To close this first investment, Mr. Giordano sent a car and driver to pick up Mr. Molesphini and bring him to the Trump National Golf Club in Colts Neck, New Jersey (the "Club"), where Mr. Giordano was a member. (SAC ¶ 44). On the strength of Mr. Giordano's promises, Mr. Molesphini "made out a certified check to NR Financial, as per [Mr.] Giordano's instructions" and got in the car. (*Id.* ¶ 44). Mr. Molesphini did not think it strange that Mr. Giordano had him make the check payable to NR Financial rather than Nue-Trition. (*Id.* ¶ 49). Mr. Giordano assured Mr. Molesphini that payment to NR Financial was a "formality" necessary for "tax reasons" that was, in practice and under the terms of their understanding, "no different from" an investment directly in Nue-Trition. (*Id.*).

Arriving at the Club, Mr. Molesphini handed Mr. Giordano the $175,000 check made out to NR Financial, and in exchange Mr. Giordano gave him a "Stock Sale and Purchase Agreement" (the "2015 Sale and Purchase Agreement") — prepared by Mr. Giordano's lawyers and emailed to Mr. Molesphini the day before — pursuant to which Mr. Molesphini acquired "90 shares of 'common stock' of Nue-Trition from NR Financial, a 'shareholder' in Nue-Trition, in return for his payment of $175,000." (SAC ¶ 45). Mr. Molesphini signed the 2015 Sale and Purchase Agreement on the spot. (*Id.*

¶ 47). Under an Operating Agreement Mr. Giordano had emailed Mr. Molesphini the day before (the "2015 Operating Agreement"), Mr. Molesphini at that point obtained a nine percent membership interest in Nue-Trition. (*Id.*). Mr. Giordano, for his part, held a fifty-one percent majority interest, and the 2015 Operating Agreement further "vested all management rights" in Mr. Giordano and his brother. (*Id.* ¶¶ 46-47). The Giordano brothers thus enjoyed "'full and complete authority and power to manage and control the business, investment, or other activities and affairs and property of' Nue-Trition." (*Id.* ¶ 46). By contrast, Mr. Molesphini had no management rights under the terms of the 2015 Operating Agreement. (*Id.*).

Mere days after NR Financial received Mr. Molesphini's $175,000 payment, Mr. Giordano, "in violation of repeated promises made to [Mr.] Molesphini, but in keeping with his true intentions that he maintained while making th[ose] promises," diverted the entirety of the investment to his personal accounts instead of directing it to Nue-Trition. (SAC ¶ 53). He proceeded to go on a "spending spree" at Mr. Molesphini's expense. (*Id.* ¶ 55). He continued frequenting Manhattan nightclubs — moving from 1 OAK to Avenue out of purported loyalty to Mr. Molesphini after Mr. Molesphini had a falling out with 1 OAK's management — spending $3,000 to $5,000 per visit, and began to date an Avenue waitress, Jade Turner. (*Id.* ¶¶ 56-59). Mr. Molesphini questioned this extravagant spending, but Mr. Giordano explained it away in a manner designed both to endear himself to Mr. Molesphini and to impress him. (*Id.* ¶ 61). He spent such significant sums at Avenue, he said,

because he was in love with Ms. Turner, and because he never had a chance to go out when he was younger and too busy furthering his career. (*Id.*). This answer satisfied Mr. Molesphini, who did not press the issue. (*Id.*).

In reality, however, Mr. Giordano failed to devote any time or financial resources to Nue-Trition. (SAC ¶ 62). Instead, he spent the money on himself and concealed his fraudulent behavior from Mr. Molesphini. Throughout the fall of 2015, Mr. Giordano assured Mr. Molesphini that he was "working" on the business, that Reliance was "gearing up" its manufacture of the product, and that the entirety of Mr. Molesphini's $175,000 investment was funding Nue-Trition's operations even though the company had yet to make a profit. (*Id.* ¶ 63). To lull Mr. Molesphini into believing that Nue-Trition was making progress, Mr. Giordano hired "brand ambassadors," including a fashion supermodel, for marketing purposes — although the brand ambassadors never in fact did any marketing for Nue-Trition. (*Id.* ¶ 64). In addition, Mr. Giordano also continued to treat Mr. Molesphini to steak dinners at The Palm in Tribeca, where he would assure Mr. Molesphini that his money was being put to productive use, including the building of a website and product manufacturing at Reliance. (*Id.* ¶ 65). Mr. Giordano reiterated that he was taking "no salary" and would "draw no profit" until Nue-Trition was profitable. (*Id.* ¶ 67). All the while, however, he was using Mr. Molesphini's money to fund his own lifestyle. (*Id.*).

### 3. Mr. Giordano Solicits the Second Investment from Mr. Molesphini and Again Diverts It to Himself

In the fall of 2015, Mr. Giordano called Mr. Molesphini to complain about Mr. Kizenko, Mr. Giordano's supposed partner in Nüe Resource who was at the boxing match. (SAC ¶ 68). Mr. Giordano told Mr. Molesphini that he had a falling out with Mr. Kizenko, wanted to "buy him out," and offered Mr. Molesphini an unspecified interest in Nüe Resource in return for $250,000. (*Id.*). Mr. Giordano said that Nüe Resource would be sold in less than three years, so Mr. Molesphini could quickly turn a profit. (*Id.*). Though initially hesitant, Mr. Molesphini agreed to invest — because he trusted Mr. Giordano and believed that Mr. Giordano was putting his initial investment to good use. (*Id.* ¶¶ 69-71).

On or about January 5, 2016, Mr. Molesphini entered into a Stock Sale and Purchase Agreement (the "2016 Sale and Purchase Agreement"), thinking that he was purchasing an interest in Nüe Resource. (SAC ¶ 71). The parties to the 2016 Sale and Purchase Agreement were Elephant Entertainment, Inc., an entity wholly owned by Mr. Molesphini, and NR Financial. (*Id.*). Under the terms of the 2016 Sale and Purchase Agreement, Mr. Molesphini paid a total of $234,600 to NR Financial in return for a grant of 151 "shares" of Nue-Trition and one-and-a-half percent of the proceeds of any sale of "NR Funding." (*Id.* (emphasis omitted)). But once NR Financial received the $234,600 payment, Mr. Giordano transferred it to his personal accounts. (*Id.* ¶ 73).

Mr. Molesphini's investments with Mr. Giordano thus totaled $409,600, and with the new cash injection, Mr. Giordano's "spending spree" accelerated. (SAC ¶ 74). He continued to frequent Avenue and added nightclubs Goldbar and Tao to the rotation. (*Id.*). He also spent lavishly on Ms. Turner, treating her and her friends to weekly dinners at upscale Manhattan restaurants like Cipriani and Philippe Chow. (*Id.* ¶ 75). And he took Ms. Turner on "pleasure trips," including to Las Vegas and the Fontainebleau Hotel in Miami. (*Id.*). This conduct occurred from 2016 through 2019, and in 2016 Mr. Molesphini discovered "yet another fact" suggesting that Mr. Giordano was living extravagantly: He did not reside exclusively in New Jersey, but rather rented an expensive apartment in the Chelsea neighborhood of Manhattan for his personal use. (*Id.* ¶¶ 60, 74).

In the meantime, Mr. Giordano continued to lull Mr. Molesphini into believing that Nue-Trition was progressing. (SAC ¶ 78). Over dinners at The Palm, he would tell Mr. Molesphini that he was "working on it," that development of business "takes time," and told Mr. Molesphini to be "patient." (*Id.*). Indeed, some level of production and sales did ostensibly occur. Soon after the 2016 Sale and Purchase Agreement, Mr. Giordano provided Mr. Molesphini a sample container of product with a Nue-Trition label that was purportedly manufactured by Reliance. (*Id.* ¶ 79). Mr. Giordano explained that until mass production began, he would store all containers of product at Nüe Resource's offices in New Jersey. (*Id.*). Over the next 18 months, Mr. Molesphini received about eight more sample containers. (*Id.*). Each time, Mr.

Giordano promised Mr. Molesphini that more would be manufactured in the near future; Mr. Molesphini just needed to be patient. (*Id.*). Also in 2016, Nue-Trition sold about $600-$1,000 worth of product. (*Id.* ¶ 80). But when customers complained that they did not receive the product they ordered, Mr. Giordano would point the finger at Reliance. (*Id.*).

### 4. Mr. Molesphini Grows Suspicious and Eventually Discovers the Fraud

By late 2016, "it became apparent to [Mr.] Molesphini that little to no progress was being made on developing and growing Nue-Trition's operations." (SAC ¶ 82). The company still had no working website, even though e-commerce was supposed to be its primary source of revenue. (*Id.*). Little to no product was being manufactured. (*Id.*). The company's "ambassadors" were inactive for lack of any product to market. (*Id.*). No contracts had been executed with any gyms or other retail outlets. (*Id.*). "In short, nearly a year after [Mr.] Molesphini had invested $409,600 into Nue-Trition, the company remained little more than a business plan and the subject of [Mr.] Giordano's ongoing boasts and promises of future riches." (*Id.*).

Nevertheless, Mr. Molesphini was not willing to initiate "an open conflict" with Mr. Giordano. (SAC ¶ 83). For one, he still trusted Mr. Giordano to at least ensure that Nue-Trition's supplement would be manufactured in large numbers in the near future. (*Id.*). More importantly, Mr. Molesphini felt that, with $409,600 of his funds at Mr. Giordano's mercy, a conflict with Mr. Giordano would not be to his advantage if he wanted to realize any sort of return on his investment. (*Id.*).

But by the fall of 2016, Mr. Giordano began "actively avoiding" Mr. Molesphini. (SAC ¶ 84). He drew from an ever-evolving roster of excuses to duck Mr. Molesphini and to justify Nue-Trition's stagnancy, each excuse more implausible than the last. (*Id.*). On at least three occasions, Mr. Giordano cancelled scheduled meetings with Mr. Molesphini as a result of a "flat tire." (*Id.* ¶ 85). Many times, Mr. Giordano claimed that he could not work on Nue-Trition because he was "sick." (*Id.*). He also told Mr. Molesphini that he could not dedicate the necessary time to Nue-Trition because his car "was stolen out of his driveway," his "grandfather was dying," and he had gotten into several "bad car accidents." (*Id.*). At one point, in the course of a single week in October 2016, Mr. Giordano claimed that he could not meet to discuss Nue-Trition because of an incredible string of near-simultaneous tragedies: (i) the death of his cousin, (ii) the death of his uncle, (iii) his grandfather's hospitalization, and (iv) Mr. Giordano's own "seizure" caused by a purported "brain abnormality." (*Id.* ¶ 86).

Still, Mr. Giordano continued to live the high life. (SAC ¶ 87). On the rare occasions in 2016 when he met with Mr. Molesphini, he wore a new gold chain and luxury watches from Rolex and Hublot. (*Id.* ¶ 88). Another time in 2017, instead of showing up to a meeting with Mr. Molesphini to discuss business, Mr. Giordano invited him at the last minute to a concert at Barclays Center featuring The Weeknd that he was attending with Ms. Turner and her friends. Seizing the opportunity to pin down Mr. Giordano, Mr. Molesphini

attended and learned that Mr. Giordano had spent $12,000 on his guests' suite-level tickets. (*Id.*).

"In the summer of 2017, [Mr.] Molesphini began to strongly suspect that he was a victim of a fraudulent scheme" — when Mr. Giordano introduced him to another fraud victim, Annie Leonard. (SAC ¶ 89). Ms. Leonard was a jeweler in New Jersey near Nüe Resource's offices, and Mr. Giordano connected the two so that Mr. Molesphini could purchase an engagement ring. (*Id.*). When Ms. Leonard visited Mr. Molesphini at his apartment, she noticed a labeled container of Nue-Trition's product and, "[t]o [Mr.] Molesphini's shock," revealed that she and her mother had invested $200,000 in Nue-Trition, that she had received no information about the company since her investment, and that Mr. Giordano had not returned any part of her investment. (*Id.* ¶ 90).

Mr. Molesphini later confronted Mr. Giordano about Ms. Leonard's investment, but he became defensive and told Mr. Molesphini that Ms. Leonard's investment "d[id] not concern" him. (SAC ¶ 91). Mr. Giordano did promise to provide Nue-Trition's profit and loss statements and other financial documents, but he never followed through. (*Id.*).

Instead, on November 8, 2017, Mr. Molesphini received a mass email from Mr. Giordano, "addressed to various undisclosed persons," discussing his latest period of absence. (SAC ¶ 92). Mr. Giordano explained

> that in recent days, he had "to deal with things with my two sons that I hope none of you ever have to." Further, his grandfather was "in the ER" (as before, in 2016) and had "gone blind totally in one eye." To attend to these allegedly pressing family matters, [Mr.] Giordano

> announced that he would "be away" from his business affairs for an "indefinite" period.

(*Id.* ¶ 93). But to assuage his recipients' concerns, Mr. Giordano committed that for businesses like Nue-Trition in which investments had been made but that had "not yet generated any revenue or profit," a "full reimbursement" of investment would be forthcoming, "plus 10% interest on that money[,] so no one has to feel like their money has just sat somewhere and didn't earn anything." (*Id.* ¶ 94 (alteration in original)).

Later, around Christmas 2017, Mr. Giordano advised Mr. Molesphini that he had found a "major India-based investor for Nüe Resource," and that Mr. Molesphini would be paid with the proceeds of that deal. (SAC ¶ 98). Throughout 2018, Mr. Giordano promised that the "deal" was about to "close." (*Id.*). But by early 2019, the deal had not materialized, and Mr. Giordano stopped responding to Mr. Molesphini's messages. (*Id.*).

This was around the time that Mr. Molesphini discovered, in his words, "[c]lear [c]onfirmation" of Mr. Giordano's fraud. (SAC 22). Mr. Molesphini obtained this confirmation when he spoke with a representative of Reliance in early 2019. (*Id.* ¶ 99). In response to Mr. Molesphini's questions about whether Nue-Trition's product was still being manufactured, the representative said that "the Nue-Trition account was 'briefly' opened a 'few years ago,' that a 'single' batch of the product was manufactured, but that Mr. Giordano never paid Reliance for this batch, and the account was closed for non-payment two years ago." (*Id.*). And finally, in November 2019, Mr. Molesphini met Sokie Shehu, another acquaintance of Mr. Giordano, who told Mr. Molesphini that

she had been defrauded of her $50,000 investment in Nue-Trition under similar circumstances. (*Id.* ¶ 100). This news "further confirmed what [Mr. Molesphini had] already realized": that instead of investing his life savings, Mr. Giordano had absconded with the money, "using it for his personal purposes and utterly failing to carry out his duties as CEO of Nue-Trition." (*Id.* ¶ 101).

**B. Procedural Background**

Mr. Molesphini commenced this action on July 14, 2020, with the filing of a complaint (Dkt. #1), which he later amended for the first time on August 13, 2020 (Dkt. #5). Then, on January 8, 2021, the parties jointly informed the Court that New Jersey state prosecutors had charged Mr. Giordano with "second-degree theft by deception and second-degree misconduct by a corporate official in connection with accusations that he stole approximately $1.1 million from victims, including [Mr.] Molesphini," by duping them into believing "that they were buying shares in or loaning money to his various companies, including … Nue-Trition Weight Management, LLC, Nüe Resource Financial Corp., and Nüe Resource Funding, LLC[.]" (Dkt. #31). The Court held a conference a few days later and on January 25, 2021, stayed this case pending the resolution of Mr. Giordano's criminal case. (January 14, 2021 Minute Entry; Dkt. #34).

Three and a half years later, on August 1, 2024, Mr. Molesphini sought to lift the stay. (Dkt. #35). He advised the Court that Mr. Giordano had "pleaded guilty to Misconduct by a Corporate Official in the Second Degree (N.J.[S.A.] § 2C:21-9), a felony under New Jersey law" and that Mr. Giordano

had "agreed to make full restitution to the several victims in the criminal case, including [Mr.] Molesphini," in exchange for the prosecutors' recommendation that he enter "Pre-Trial Intervention" and, if he successfully completed this program, eventual "vacatur of his plea" and "dismissal of his indictment." (*Id.*). At that time, Mr. Giordano had "made full restitution to his victims ... other than [Mr.] Molesphini," whom he had repaid $262,000. (*Id.*). But the Court denied Mr. Molesphini's request to lift the stay without prejudice to its renewal because Mr. Giordano's criminal case was not fully resolved, and any potential conviction had not been made final. (Dkt. #40).

A few months later, Mr. Molesphini again asked the Court to lift the stay. (Dkt. #41-42). The Court briefly granted this request (Dkt. #43) before quickly reimposing the stay (Dkt. #46) after Mr. Giordano clarified that his criminal case was still ongoing (Dkt. #44-45). The Court denied a third request to lift the stay on November 13, 2024, determining that the criminal case had still not fully resolved. (Dkt. #52).

Finally, on June 20, 2025, the Court granted Mr. Molesphini's fourth request to lift the stay, this time unopposed by Mr. Giordano. (Dkt. #56). Mr. Giordano had successfully completed the Pre-Trial Intervention program — including by making a total restitution payment to Mr. Molesphini of $350,000 — and had thus secured dismissal of the criminal charges against him. (Dkt. #53).

With the criminal case concluded, this Court permitted the civil action to go forward. Mr. Molesphini amended his complaint a second time — filing the

SAC with leave of the Court on December 2, 2025 (Dkt. #84) — and the parties briefed the motion to dismiss now before the Court. Mr. Giordano filed his opening brief on January 12, 2026 (Dkt. #99), Mr. Molesphini filed his opposition on February 2, 2026 (Dkt. #101), and Mr. Giordano replied on February 16, 2026 (Dkt. #102).

## DISCUSSION

### A. Applicable Law

Mr. Giordano seeks dismissal of Mr. Molesphini's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. When considering such a motion, a court "draw[s] all reasonable inferences in [a plaintiff's] favor, assume[s] all well-pleaded factual allegations to be true, and determine[s] whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). Nevertheless, the court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)). Indeed, plaintiffs must do more than provide a "formulaic recitation of the elements of a cause of action" — that is, their "[f]actual

allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## B. Analysis

Mr. Molesphini brings four claims against Mr. Giordano. All but the first survive. The Court will address each in turn.

### 1. Count I Fails to State a Claim for Securities Fraud Because the Statute of Limitations Has Expired

In Count I, Mr. Molesphini alleges that Mr. Giordano violated Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. (SAC ¶¶ 104-119). Such a private securities fraud claim is subject to both a statute of limitations and a statute of repose; that is, a claim is timely only if filed "not later than the earlier of ... [i] 2 years after the discovery of the facts constituting the violation; or [ii] 5 years after such violation." 28 U.S.C. § 1658(b); *see also Cypress Holdings, III, L.P.* v. *Sport-BLX, Inc.*, No. 22 Civ. 1243 (LGS), 2025 WL 2780122, at *3 (S.D.N.Y. Sept. 30, 2025).

The parties debate the limitations provision, *i.e.*, whether more than two years passed between Mr. Molesphini's discovery of the fraud and the filing of his claim. (Def. Br. 9-18; Pl. Opp. 21-22). This two-year period "begins when a 'reasonably diligent plaintiff would have discovered the facts constituting the violation,' including particularized facts necessary to plead the claim — not merely when the plaintiff suspects wrongdoing." *Cypress Holdings, III, L.P.*, 2025 WL 2780122, at *3 (quoting *Merck & Co.* v. *Reynolds*, 559 U.S. 633, 637

(2010)). "In other words, the limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." *City of Pontiac Gen. Emps.' Ret. Sys.* v. *MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011).

Applying this standard, the Court concludes that a reasonable investor in Mr. Molesphini's position would have discovered the fraud within the meaning of Section 1658(b) no later than the summer of 2017. Accordingly, Mr. Molesphini's Section 10(b) and Rule 10b-5 claim expired about one year before he initiated this action on July 14, 2020. Mr. Molesphini resists this result, arguing that the limitations period did not begin to run until "early 2019," when he spoke with the representative from Reliance and learned that Reliance had never produced more than a single batch of product for Nue-Trition some years prior. (SAC ¶ 99; Pl. Opp. 21-22). But Mr. Molesphini's own complaint prevents the Court from agreeing with him.

In his words, "[i]n the summer of 2017, [Mr.] Molesphini began to strongly suspect that he was a victim of a fraudulent scheme." (SAC ¶ 89). This realization occurred when Ms. Leonard told him that she too had made a sizable investment in Nue-Trition — $200,000 — and had yet to receive any information about Nue-Trition's progress, let alone any return on that investment. (*Id.* ¶ 90). More than constituting strong suspicion — given the deluge of warning signs that had already accrued — Ms. Leonard's revelation should have demonstrated to Mr. Molesphini sufficient facts to establish the

fraud full stop. *See Merck & Co.*, 559 U.S. at 653 (explaining that, while "the limitations period does not begin to run until ... a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,'" "'storm warnings' may be useful" in identifying "a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating"). By late 2016, Mr. Molesphini alleges, it had already become "apparent to [him] that little to no progress was being made on ... Nue-Trition[ ]." (*Id.* ¶ 82). Nue-Trition had no website; it had produced almost no product; the brand ambassadors were doing nothing; and the company had secured no sales contracts. (*Id.*). Mr. Giordano was "actively avoiding" Mr. Molesphini, hiding behind increasingly ridiculous excuses. (*Id.* ¶¶ 84-85 (rattling off various car troubles and health emergencies)). All the while, he continued to spend extravagantly — on new jewelry, watches, concerts, and his Chelsea apartment. (*Id.* ¶¶ 60, 88). Against this backdrop, the encounter with Ms. Leonard would have been the final straw for a reasonably diligent investor. *See Arco Cap. Corps. Ltd.* v. *Deutsche Bank AG*, 949 F. Supp. 2d 532, 546 (S.D.N.Y. 2013) ("Because the allegations in the Complaint ... demonstrate that [plaintiff] could have discovered the facts constituting the violation within two years of the date upon which a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint, [plaintiff's] Section 10(b) claims have expired." (internal quotation marks and citation omitted)); *DoubleLine Cap. LP* v. *Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 438-39 (S.D.N.Y. 2018) (collecting cases).

The Court is sympathetic to Mr. Molesphini's position as an earnest and trusting victim who was wooed by Mr. Giordano's predatory tactics, and who then felt hamstrung while Mr. Giordano controlled his life savings. But this sympathy cannot override the law's clear instruction that Section 1658(b)'s limitations period must commence when a reasonable investor would have uncovered the facts demonstrating Mr. Giordano's fraudulent conduct. *See City of Pontiac Gen. Emps.' Ret. Sys.*, 637 F.3d at 174. And as discussed, unfortunately for Mr. Molesphini, to such a reasonable investor in his shoes, Ms. Leonard's revelation in the summer of 2017 constituted facts that demonstrated the fraud and provided sufficient grounds to plead it. Moreover, no reasonable investor would have waited two years to call Reliance to obtain "[c]lear [c]onfirmation" of the fraud; Mr. Molesphini should have made the call days later, and especially after Mr. Giordano's wildly suspicious November 8, 2017 email. (*See* SAC 22; *id.* ¶¶ 92-94). Because the statute of limitations expired about a year before Mr. Molesphini brought suit, the Court must dismiss Count I.

**2. Count II States a Claim for Fraud in the Inducement**

Before proceeding with its analysis of Count II, the Court pauses briefly to address its jurisdiction over this case. Count I conferred upon the Court federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa. But Count I is now dismissed. The remaining counts arise under state

common law.[2] The Court need not, however, determine whether to exercise supplemental jurisdiction over these claims because it independently retains diversity jurisdiction over them pursuant to 28 U.S.C. § 1332: the amount in controversy exceeds $75,000 (SAC 31 (demanding compensatory damages as well as punitive damages no less than $5,000,000)), and there is complete diversity of the parties (*id.* ¶¶ 12-14 (alleging that Mr. Molesphini and Elephant Entertainment are citizens of New York, while Mr. Giordano is a citizen of New Jersey)).

Secure in its jurisdiction over the remaining claims, the Court now turns to Count II and determines that it states a claim for relief. Count II alleges fraud in the inducement, asserting that "[i]n order to induce [Mr.] Molesphini to enter into the 2015 and the 2016 [Sale and Purchase] Agreements, [Mr. Giordano] made numerous untrue representations of fact which he knew to be untrue." (SAC ¶ 122).

"To state a claim for fraud in the inducement, [Mr. Molesphini] must allege: (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by

---

2 The parties assume that New York state law applies to Counts II and IV, and that New Jersey law applies to Count III. (*See* Def. Br. 18 (expressly discussing which state law applies only as to Count II)); Pl. Opp. 13, 20, 23 (addressing Counts II, III, and IV); Def. Reply 8 (incorrectly asserting that "SDNY law" governs Count III, a state-law claim); *id.* at 9 (failing to contest Plaintiff's assumption that New York law applies to Count IV)). The Court agrees. *See Sackin* v. *TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 747 n.1 (S.D.N.Y. 2017) ("The parties' briefs assume that New York state law governs this case, and such implied consent is sufficient to establish the applicable choice of law." (alterations adopted and internal quotation marks omitted) (quoting *Trikona Advisers Ltd.* v. *Chugh*, 846 F.3d 22, 31 (2d Cir. 2017))); *Liberty Mut. Ins. Corp.* v. *N.Y. Marine & Gen. Ins. Co.*, 505 F. Supp. 3d 260, 269 n.4 (S.D.N.Y. 2020) ("The Court applies New York law because the parties' briefing assumes New York law applies.").

[Mr. Molesphini]; and (iv) resulting damages." *Johnson* v. *Nextel Commc'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011) (citing *Ross* v. *Louise Wise Servs., Inc.,* 8 N.Y.3d 478, 488 (2007); *Banco Popular N. Am.* v. *Gandi,* 184 N.J. 161, 172-73 (2005)). "In addition, [Mr. Molesphini] must allege specific facts as to the fraud, including the misleading statements, speaker, time, place, individuals involved, and specific conduct at issue." *Id.* (citing Fed. R. Civ. P. 9(b)).

Mr. Giordano argues that Mr. Molesphini fails to satisfy each of these pleading requirements (Def. Br. 18-26), but the Court disagrees. To begin, Mr. Giordano attacks the first element of the fraudulent inducement claim — material misrepresentation of a presently existing or past fact — on two grounds. *First,* he argues that Mr. Giordano's statements at issue were mere puffery or corporate optimism. (*Id.* at 19-20). Not so. The SAC precisely pleads that Mr. Giordano promised to use Mr. Molesphini's investments to fund Nue-Trition's supplement business but instead stole the money for his own personal uses. (*E.g.,* SAC ¶¶ 42-43, 53-67, 78, 101). Such explicit misrepresentations do not qualify as puffery. *See Senior Health Ins. Co. of Pa.* v. *Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 527 (S.D.N.Y. 2018).

*Second*, Mr. Giordano argues that the SAC fails to allege misrepresentations of existing or past facts; rather, he says, his promises to direct Mr. Molesphini's investments to Nue-Trition's business concerned future performance. (Def. Br. 19-20). While it is true that "a 'mere promissory statement as to what will be done in the future' does not constitute a material misrepresentation of fact, a promise 'made with a preconceived and

undisclosed intention of not performing it' does." *Spinelli* v. *Nat'l Football League*, 903 F.3d 185, 210 (2d Cir. 2018) (quoting *Deerfield Commc'ns Corp.* v. *Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986)). Because that is exactly what the SAC pleads (*e.g.*, SAC ¶ 109 ("At the time that [Mr.] Giordano made these promises to [Mr.] Molesphini to induce [Mr.] Molesphini to enter into the 2015 [Sale and Purchase] Agreement, he had no intention of keeping them.")), this argument is likewise unpersuasive.

Next, Mr. Giordano argues that the SAC fails to allege that he intended to deceive Mr. Molesphini. (Def. Br. 21). More particularly, he contends that he was not aware that his statements were false when he made them. (*Id.*). But again, the SAC carefully alleges a host of facts making plain that Mr. Giordano contemporaneously had no intention of following through on his promises to use Mr. Molesphini's money to develop Nue-Trition. The SAC alleges that Mr. Giordano: (i) failed to pay Reliance anything, including failing to pay it for the sole batch of Nue-Trition product ever manufactured; (ii) produced almost no product; (iii) led a lavish lifestyle fueled by investor funds despite promises that he would take no salary for work on Nue-Trition; (iv) failed to build a working website for Nue-Trition; (v) failed to activate the company's marketing ambassadors; and (vi) failed to enter into any sales contracts with gyms or other retail outlets. (Pl. Opp. 17 (advancing this argument)). In this way, by specifically alleging that Mr. Giordano bilked Mr. Molesphini out of nearly a half million dollars to fund his own entertainment — and not Nue-Trition, the

object of Mr. Molesphini's investments — the SAC plainly illustrates Mr. Giordano's intent to deceive.

As for the third element of the fraudulent inducement claim, Mr. Giordano argues that Mr. Molesphini's reliance on his misrepresentations was not reasonable. (Def. Br. 21-22). He asserts that because written agreements governed their relationship — here, the 2015 and 2016 Sale and Purchase Agreements, and the 2015 Operating Agreement — Mr. Molesphini cannot rely on any prior oral agreements. (*Id.* (mentioning only the Sale and Purchase Agreements)). As a threshold matter, reasonable reliance on a misrepresentation is a "nettlesome" and "fact-intensive" inquiry that does not ordinarily support dismissal at the motion to dismiss stage. *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 186 n.19 (2d Cir. 2015) (internal quotations marks and citation omitted); *accord Le Metier Beauty Inv. Partners LLC* v. *Metier Tribeca, LLC*, No. 13 Civ. 4650 (JFK), 2015 WL 769573, at *3 (S.D.N.Y. Feb. 24, 2015) ("The reasonableness of a plaintiff's reliance on alleged misrepresentations is an intensely fact-specific inquiry and is generally considered inappropriate for determination on a motion to dismiss." (alterations adopted) (internal quotation marks and citation omitted)). That principle holds true here, and so the Court determines, at least for now, that the SAC has alleged Mr. Molesphini's reasonable reliance.

It is generally the case, as Mr. Giordano contends, that under New York law "[m]isrepresentations made to induce a party to enter a contract are not actionable as fraud." *Spinelli*, 903 F.3d at 209. Thus, "[i]t is unreasonable as a

matter of law for a plaintiff to claim to have relied on oral misrepresentations that are contradicted in written offering materials." *Kosovich* v. *Metro Homes, LLC*, No. 09 Civ. 6992 (JSR), 2009 WL 5171737, at *4 (S.D.N.Y. Dec. 30, 2009) (internal quotation marks and citation omitted), *aff'd*, 405 F. App'x 540 (2d Cir. 2010) (summary order). Ordinarily in such circumstances, the appropriate claim is for breach of contract. *See Wall* v. *CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006).

But that is not to say that "a fraud claim based on a false promise made in contract negotiations c[an] never succeed." *Spinelli*, 903 F.3d at 210. "New York law specifically recognizes causes of action for fraud in the inducement when the misrepresentation is collateral to the contract it induced." *Wall*, 471 F.3d at 416. This carveout for collateral misrepresentations means that "the alleged fraud will *always* concern an action that was not prohibited by the contract itself." *Spinelli*, 903 F.3d at 210.

Demonstrating the fact-intensiveness of the reasonable-reliance inquiry, here, the question of whether the Agreements prohibited Mr. Giordano from using Mr. Molesphini's money for any non-Nue-Trition purpose is difficult to resolve without knowing the precise language of the Agreements. If the Agreements did contain such prohibitions, the fraudulent inducement claim could not lie. But given the misleading nature in which Mr. Giordano solicited Mr. Molesphini's investments, as well as the confusing and indirect structure of those transactions — including the fact that payment to NR Financial resulted in shares of Nue-Trition due to NR Financial's purported status as a

shareholder of Nue-Trition (SAC ¶¶ 45, 71) — the Court cannot at this stage determine what the Agreements prohibited. Indeed, the reasonable inference to draw from the SAC is that the Agreements did *not* prohibit Mr. Giordano from using Mr. Molesphini's money for his own purposes: after all, the 2015 Operating Agreement afforded Mr. Giordano and his brother "full and complete authority and power to manage and control the … investment[.]" (*Id.* ¶ 46). Accordingly, the SAC adequately pleads that Mr. Molesphini reasonably relied on Mr. Giordano's oral misrepresentations that he would direct the money solely to developing Nue-Trition — although it is possible that discovery will ultimately lead to a different conclusion.

Turning to the final element of a fraudulent inducement claim, Mr. Giordano argues that the SAC fails to plead damages. (Def. Br. 22-23). In particular, he says, the SAC fails to allege a causal connection between the fraudulent inducement and Mr. Molesphini's injury because "the speculative nature of the supplement market," not Mr. Giordano's material misrepresentations, "was the proximate cause of the loss." (*Id.*). But that is not remotely the story the SAC tells. According to its allegations, Mr. Giordano never made a real attempt to enter the supplement market; rather, that market merely provided the narrative backdrop for Mr. Giordano's elaborate ruse to steal Mr. Molesphini's money. As the SAC pleads, Mr. Giordano's misrepresentations that he would put Mr. Molesphini's money only toward Nue-Trition were not just the proximate cause but the sole cause of the losses. The SAC therefore adequately pleads damages. *Cf. Hansen* v. *Wwebnet, Inc.*,

No. 14 Civ. 2263 (ALC), 2015 WL 4605670, at *5-6 (S.D.N.Y. July 31, 2015) (holding that the plaintiff's "claims of fraudulent inducement of his investments [were] direct" where "he would never have invested in the first place but for that fraud").[3]

In sum, Count II states a claim for fraud in the inducement.

**3. Count III States a Claim for Breach of Fiduciary Duty**

In Count III, Mr. Molesphini alleges that Mr. Giordano, "as CEO of Nue-Trition and as its managing member" violated the "fiduciary duties of due care, good faith, and loyalty" that he owed other members of the LLC, including Mr. Molesphini, by "fail[ing] to develop the business of Nue-Trition, to the detriment of the LLC and its members." (SAC ¶¶ 135-136). These duties derive from New Jersey law, *Kiely* v. *Iler*, No. A-1363-22, 2024 WL 540586, at *7 (App. Div. Feb. 12, 2024) ("A managing member of an LLC owes a fiduciary duty to his co-members." (citing, *inter alia*, N.J.S.A. § 42:2C-39 (discussing "the duties of loyalty and care" and "the contractual obligation of good faith and fair dealing"))) — which, pursuant to the internal affairs doctrine, governs Mr. Molesphini's fiduciary duty claim because Nue-Trition is incorporated in New Jersey, *Mindspirit, LLC* v. *Evalueserve Ltd.*, 346 F. Supp. 3d 552, 580 (S.D.N.Y. 2018) (collecting cases); *Hau Yin To* v. *HSBC Holdings, PLC*, 700 F. App'x 66,

---

3 Mr. Giordano also argues that the SAC flunks Rule 9(b)'s particularity requirement (Def. Br. 23-26), but the foregoing analysis — as well as the entire Factual Background above — demonstrates why that argument fails.

68-69 (2d Cir. 2017) (summary order); *Galef* v. *Alexander*, 615 F.2d 51, 58 (2d Cir. 1980). (SAC ¶ 36).

At the outset, the Court notes an issue that, while not fatal to Count III at this stage, will require further refinement as the case proceeds. That is, it is not clear that Mr. Molesphini was ever a member of Nue-Trition — and if Mr. Molesphini was not a member, Mr. Giordano never owed him fiduciary duties in the first place.

The 2015 and 2016 Sale and Purchase Agreements illustrate this potential concern. According to those Agreements, each of Mr. Molesphini's investments granted him "shares" in Nue-Trition. In the first transaction, he acquired "90 shares of 'common stock' of Nue-Trition from NR Financial, a 'shareholder' in Nue-Trition, in return for his payment of $175,000." (SAC ¶ 45). In the second transaction, he "paid a total of $234,600 to NR Financial in return for a grant of 151 'shares' of Nue-Trition[ ] and … 1.5 percent of the proceeds of any sale of NR Funding." (*Id.* ¶ 71 (emphasis omitted)). The potential problem with these transactions, as the SAC itself posits, is that "Nue-Trition was an LLC and thus could not, strictly speaking, offer 'shares' for sale." (*Id.* ¶ 48).

If Mr. Molesphini's ownership interest in Nue-Trition were indeed limited to these shares, that might foreclose his fiduciary duty claim. As a general matter of corporate law, LLCs cannot issue shares or common stock, as the 2015 and 2016 Sale and Purchase Agreements purport to do — only membership interests. *Limited liability companies*, 1 Fletcher Cyc. Corp. § 20

(“A ‘membership interest’ is an ownership interest in a limited liability company and is akin to an interest in stock of a corporation, and such interests may be evidenced by a certificate of membership interest, similar to stock issues.”); *see also* N.Y. LLC Law §§ 102(q)-(r), 402(c)(1). That said, New Jersey law appears to take a slightly different approach. New Jersey calls a membership interest a “transferable interest.” N.J.S.A. § 42:2C-2 (West); *see also id.* § 42:2C-42 (West). And under New Jersey law, “[a] person may become a member [of a limited liability company] *without* acquiring a transferable interest.” *Id.* § 42:2C-31(d) (West) (emphasis added). Instead, “[a]fter formation of a limited liability company,” one alternative way that “a person becomes a member” is “as provided in the operating agreement.” *Id.* § 42:2C-31(c)(1). Here, in light of the 2015 Operating Agreement, this provision salvages Count III.

Pursuant to the 2015 Operating Agreement, when Mr. Molesphini made his initial $175,000 investment, he received “a nine percent membership interest in Nue-Trition.” (SAC ¶¶ 46-47). While it is unclear to the Court precisely what kind of ownership interest Mr. Molesphini obtained — surely in no small part because of the intentionally obfuscatory nature in which Mr. Giordano structured the transaction — the 2015 Operating Agreement nonetheless demonstrates that Count III plausibly states a claim for two reasons. *First*, even if New Jersey law required LLC ownership to be conveyed through membership (or transferable) interests, Mr. Molesphini satisfies this requirement under the terms of the 2015 Operating Agreement. To be sure, the 2015 Sale and Purchase Agreement’s alternative grant of ownership

interest via shares of stock presents a confusing terminological wrinkle, but at this stage the Court lays the blame for this confusion at Mr. Giordano's feet. Drawing all reasonable inferences in Mr. Molesphini's favor, the Court concludes that the 2015 Operating Agreement plausibly granted Mr. Molesphini a membership interest in Nue-Trition. *Second*, and more simply, Section 42:2C-31(c)(1) permitted Mr. Molesphini to become a member of Nue-Trition pursuant to whatever terms were "provided in the operating agreement." In this case, the 2015 Operating Agreement made Mr. Molesphini a member of Nue-Trition via his nine percent membership interest. (SAC ¶¶ 46-47). That too is enough to establish that Mr. Giordano owed him fiduciary duties as a member of Nue-Trition.

Additionally, it bears mentioning that the SAC does not identify any operating agreement governing Mr. Molesphini's second, $234,600 investment. So the two reasons that the 2015 Operating Agreement made Mr. Molesphini a member of Nue-Trition do not apply to his 2016 investment; he obtained no membership or transferrable interest, and there was no operating agreement to establish his LLC membership via Section 42:2C-31(c)(1). Ultimately, however, this distinction does not doom Count III because Mr. Molesphini was already a member of Nue-Trition by virtue of the 2015 Operating Agreement, as described above. Thus, Mr. Giordano already owed Mr. Molesphini fiduciary duties, independent of the second investment.

Having dispensed with this potential threshold issue, the Court now turns to the sole attack Mr. Giordano levies against this claim. He argues that

Count III should be dismissed because Mr. Molesphini must bring it derivatively on behalf of Nue-Trition. (Def. Br. 26-27). Because Mr. Molesphini has instead brought the claim directly on behalf of himself, Mr. Giordano argues, he has both failed at the outset "to allege the breach of any duty owed directly to [him] by [Mr. Giordano]" and has further failed "to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 23.1." (*Id.* at 27).

Mr. Molesphini is correct to bring this breach of fiduciary duty claim directly on his own behalf. Simply put, "a minority shareholder has standing to bring a direct cause of action against a majority shareholder for breach of a fiduciary duty." *Roll* v. *Singh*, No. 07 Civ. 4136 (FLW), 2008 WL 3413863, at *7 (D.N.J. June 26, 2008) (citing *Davis* v. *U.S. Gypsum Company*, 451 F.2d 659, 662 (3d Cir. 1971) ("It is hornbook law that ... where a corporation[ ] tortiously conspires with others to damage an individual and does so[,] a cause of action arises which belongs to the individual.")); *cf. Pepe* v. *Gen. Motors Acceptance Corp.*, 254 N.J. Super. 662, 667 (App. Div. 1992) ("On its face, a conspiracy to force a stockholder to sell her stock below value is a wrong suffered directly and solely by the shareholder, not derivative of any loss or injury sustained by the corporation."); *Kolbeck* v. *LIT Am., Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996) ("Plaintiffs trusted [defendant] with their money and he owed them a fiduciary duty. By self-dealing and converting trust assets, [defendant] breached that duty. Plaintiffs suffered significant financial harm as a result of that breach." (alterations adopted) (internal quotation marks and citation

omitted)), *aff'd*, 152 F.3d 918 (2d Cir. 1998). While a derivative claim would be appropriate where a stockholder is suing for injury done to the corporation, *Small* v. *Goldman*, 637 F. Supp. 1030, 1033 (D.N.J. 1986) (citing N.J.S.A. § 14A:12–7), that rule is inapplicable here where Mr. Molesphini is suing for harm he suffered directly — namely, the theft of his $409,600. Accordingly, the Court holds that Count III states a claim for breach of fiduciary duty.

**4. Count IV States a Claim for Promissory Estoppel**

Count IV asserts a claim for promissory estoppel, also premised on Mr. Giordano's lies. It alleges that "[i]n order to induce [Mr. Molesphini] to enter into the 2015 and the 2016 Agreements, [Mr. Giordano] made numerous untrue representations of fact which he knew to be untrue" as to how he would use Mr. Molesphini's money. (SAC ¶¶ 143-144).

"Under New York law, the doctrine of promissory estoppel is a legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable contract." *That's What She Said, Inc.* v. *Gutter Games Ltd.*, No. 22 Civ. 4230 (KPF), 2024 WL 3678473, at *9 (S.D.N.Y. Aug. 5, 2024) (internal quotation marks and citation omitted), *appeal dismissed sub nom. That's What She Said, Inc.* v. *Perch UK 1 LTD*, No. 24-2106, 2024 WL 4762973 (2d Cir. Sept. 9, 2024). "To succeed on a promissory estoppel theory, a promisee must demonstrate that (i) the promisor made a 'clear and unambiguous promise'; (ii) the promisee's reliance on that promise was 'reasonable and foreseeable'; and

(iii) the promisee was injured 'as a result of the reliance.'" *Id.* (quoting *Kaye* v. *Grossman*, 202 F.3d 611, 615 (2d Cir. 2000)).

Mr. Giordano challenges Count IV by making essentially the same argument as the one he brought against the reasonable reliance element of Count II. (Def. Br. 27-28). He says that the 2015 and 2016 Agreements, as written agreements, vitiate Mr. Molesphini's promissory estoppel claim because they are valid and enforceable contracts governing the same subject matter that Count IV addresses. (*Id.* at 27). But because the Court has determined that Count II survives for now, so does Count IV. (*See* Def. Reply 9 (arguing that Counts II and IV rise and fall together)).

Generally speaking, "the existence of a valid and enforceable contract governing a particular subject matter precludes recovery under a promissory estoppel cause of action arising out of the same subject matter." *That's What She Said, Inc.*, 2024 WL 3678473, at *9 (alteration adopted) (quoting *Bennett* v. *State Farm Fire & Cas. Co.*, 121 N.Y.S.3d 298, 299 (2d Dep't 2020)). But just as the reasonable reliance element of fraudulent inducement has a carveout for collateral misrepresentations, *Wall*, 471 F.3d at 416, promissory estoppel claims may survive when there exists "a legal duty independent of the contract,'" *That's What She Said, Inc.*, 2024 WL 3678473, at *9 (quoting *Goldberg* v. *Pace Univ.*, 535 F. Supp. 3d 180, 199-200 (S.D.N.Y. 2021), *aff'd*, 88 F.4th 204 (2d Cir. 2023)) — "i.e., one arising out of circumstances extraneous to, and not constituting elements of, the contract itself," *MatlinPatterson ATA Holdings LLC* v. *Fed. Express Corp.*, 929 N.Y.S.2d

571, 578 (1st Dep't 2011). The First Department has directly linked these two exceptions, explaining that "the Court of Appeals[ ] has held that a misrepresentation of present fact, unlike a misrepresentation of future intent to perform under the contract, is *collateral* to the contract, even though it may have induced the plaintiff to sign it, and therefore involves a *separate breach of duty*." *GoSmile, Inc.* v. *Levine*, 915 N.Y.S.2d 521, 524 (1st Dep't 2010) (emphases added) (citing *Deerfield Commc'ns Corp.*, 68 N.Y.2d at 956). So, because the Court has determined that Mr. Giordano's misrepresentations about how he would direct Mr. Molesphini's funds were collateral to the 2015 and 2016 Agreements, the Court likewise concludes that those misrepresentations involved a separate breach of duty.

To be sure, this analysis slices things rather finely. As with Count II, discovery may well show that Count IV ultimately fails because the 2015 and 2016 Agreements do in fact specifically restrict Mr. Giordano's ability to direct the investments. See *SAA-A, Inc.* v. *Morgan Stanley Dean Witter & Co.,* 721 N.Y.S.2d 640, 642 (1st Dep't. 2001) ("[W]here there is an express contract no recovery can be had on a theory of implied contract." (internal quotation marks and citation omitted)). In this posture, however, the SAC alleges no such restriction. In fact, it alleges the opposite, at least with respect to the 2015 Operating Agreement, which afforded Mr. Giordano and his brother "full and complete authority and power to manage and control the … investment[.]" (SAC ¶ 46). Accordingly, for now at least, Count IV survives.

## CONCLUSION

For the foregoing reasons, Mr. Giordano's motion to dismiss is GRANTED IN PART and DENIED IN PART. The Court DISMISSES Count I with prejudice. Counts II, III, and IV survive.

Mr. Giordano shall file an answer to the SAC on or before **October 13, 2026**. On or before **October 27, 2026**, the parties shall submit to the Court a joint letter and proposed case management plan in accordance with the specifications laid out in the Notice of Initial Pretrial Conference. (*See* Dkt. #4). If the parties wish to have a conference to discuss case management concerns, they may request so in their joint letter. Similarly, if the parties wish to be referred to the designated Magistrate Judge or the Court's mediation program, they may make such a request.

The Clerk of Court is directed to terminate the pending motion at docket entry 99.

SO ORDERED.

Dated: September 22, 2026
New York, New York

Katherine Polk Failla

KATHERINE POLK FAILLA
United States District Judge